4/19/68

RECEIVED
MAR 11 2008

NANCY MAYER WHITTINGTON, **CLERK**
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

I AM REQUESTING THE COURT TO ALLOW THE
PLAINTIFF TO SUPPLEMENT FACTS AND EVIDENCE TO
CIVIL ACTION NO. 07-1027 (RJL)

STARTING WITH RACHEL CARLSON LIEBER FAX TO
MR. BALAREZO, THE PLAINTIFF'S ATTORNEY IN HIS
CRIMINAL CASE, U.S. V. ANTOINE JONE ET AL 05-386
(ESH), TITLED ("JAIL CELL SEARCH RESULTS" EXHIBIT 3.)

MS. LIEBER ADMITS SHE HAS OBTAINED COPIES OF
ALL CALLS THE PLAINTIFF MADE FROM DC JAIL, AND
SHE WAS RESPONSIBLE IN HAVING THE PLAINTIFF PLACED
IN PROTECTIVE CUSTODY. IN ADDITION SHE WAS SEEKING
TO HAVE ALL OF THE PLAINTIFF'S JAIL CALLS BURNED ONTO
A CD. BEGINNING NOVEMBER 3, 2005 THRU NOVEMBER 20,
2005 AND WAS IN THE PROCESS OF OBTAINING THE REST
OF THE PLAINTIFF'S CALLS FROM NOVEMBER 21, 2005 THRU
DECEMBER 3, 2005. ON DECEMBER 2, 2005 SHE REQUESTED
TOTAL SEPERATION FROM THE GENERAL POPULATION. RACHEL
LIEBER'S SIGNATURE IS ON THE FAX TO MR. BALAREZO.

DEFENDANT RACHEL LIEBER REQUESTED THE PLAINTIFF
TO BE PLACED IN A MAXIMUM SECURITY STATUS. I
AM INCLUDING MY CUSTODY CLASSIFICATION FORM,
WHERE IT SHOWS THE PLAINTIFF WITH A CUSTODY SCORE
OF -1 (EXHIBIT #2) WHICH PLACES ME IN GENERAL POP-
ULATION OF MINIMUM SECURITY. THE DEFENDANT'S

2

MANIPULATION CAUSED THE PLAINTIFF TO BE
PLACED IN SUPER MAXIMUM SECURITY

THE PLAINTIFF ALSO WILL REFER THE COURT TO THE
FAX TO DC JAIL WHEN RACHEL WEBER REQUESTED THAT
THE PLAINTIFF BE PLACED IN TOTAL SEPARATION (LOCK DOWN)
DATED NOVEMBER 23, 2005 AND ON DECEMBER 2, 2005. ON
DECEMBER 16, 2005 IT SHOW THE DEFENDANT EXAMINED
THE PLAINTIFF'S JAIL CALLS, (EXHIBIT 3).

WITH ALL OF THIS MONITORING AND EXAMINING OF
THE PLAINTIFF'S JAIL CALLS, THE GOVERNMENT HAS NO COURT
ORDER, WARRANT OR SUBPOENA POWER TO LISTEN TO
THE PLAINTIFF'S CALLS WHICH VIOLATED NOT ONLY THE
PLAINTIFF'S RIGHTS BUT ALL PARTIES EXPECTATION OF
PRIVACY FROM THE NON JAIL ADMINISTRATION
MONITORING, BY RACHEL WEBER AND PARTIES, ILLEGALLY
MONITORING, THESE CALL WITHOUT THE PROTECTION OF
THE COURT. I REFER TO THE COURTS TO HONORABLE
JUDGE HUVELLE'S STATEMENT SHE DON'T PUT MR JONES
IN THE HOLE, GET HIM (MR JONES) OUT OF THE HOLE. THE
JUDGE GAVE A COURT ORDER FOR THE PLAINTIFF TO GET
OUT OF SEGREGATION ASAP.

THE DEFENDANT ALSO DECEIVED DC JAIL, THE COURTS
AND THE GRAND JURY WITH PERJURY BY USING THESE
CALLS ILLEGALLY. THE PLAINTIFF REFERS THE COURT
TO (EXHIBIT 4) STEPHANIE YANTA'S GRAND JURY TESTIMONY
NOVEMBER 22, 2005 ON LAWRENCE MAYNARD. PG 12, 13, 15,
16. AGENT YANTA TALKS ABOUT THE STATEMENT OF

3

THE ILLEGALLY OBTAINED JAIL CALLS, AND THES MYSTERIOUS
LETTER TO LAWRENCE MAYNARD (ALL OF WHICH WAS
ILLEGAL AND FABRICATED STORY) THE AGENT EVEN ADMITS
THAT THEY HAD TO HAVE A SUBPOENA TO LISTEN TO THE
JAIL CALLS LEGALLY (PG 15 LINE 11-13) DURING
LAWRENCE MAYNARD'S DETENTION HEARING THE GOVERNMENT
ALSO ADMITS THE USE AND LISTENING TO THE PLAINTIFF'S
JAIL CALLS TO TRY TO GET AN OBSTRUCTION OF JUSTICE
ACCUSATION AND TO PREVENT LAWRENCE MAYNARD FROM
GETTING AND BOND. (EXHIBIT #5)

    MR CUSEMAN PUT UP A GOOD DEFENSE THAT MR
MAYNARD WASN'T VIOLENT OR EVER WITH A WEAPON
AND THE GOVERNMENT HAD NO EVIDENCE OF THE PLAINTIFF
BEING VIOLENT OR HAVING AN INTENT TO HARM OR
BE VIOLENT. THE PLAINTIFF LIKES TO POINT OUT IN
(EXHIBIT #6) IN THE FOOTNOTE NO #1, IN THE CRIMINAL
CASE. HE MOVED TO SUPPRESS THE JAIL CALLS FOR NOT
HAVING LAWFUL AUTHORITY (NO COURT ORDER, WARRANT
OR SUBPOENA) (EXHIBIT #7) MR BALAREZO REQUESTED
COPIES OF ALL DOCUMENTS SEIZED FROM MR JONES'
CELL, COPY OF SIGNED AND EXECUTED AFFIDAVIT IN
SUPPORT OF SEARCH WARRANT FOR MR JONES CELL,
AND A COPY OF ALL RECORDINGS OF MR JONES' CALLS
(EXHIBITS #8) ARE SOME OF THE ILLEGAL JAIL CALLS
THE GOVERNMENT BURNED ON C.D

    THE ARE SOME OF THE CALLS THE GOVERNMENT USED TO
GET THE DC JAIL CELL SEARCH, ALL OF WHICH VIOLATED

THE PLAINTIFF'S EXPECTATION OF PRIVACY,

(EXHIBIT #9) IS A CRUCIAL CONSTITUTIONAL VIOLATION OF DEBORAH ONEAL AND THIS EVIDENCE SHOWS THAT THE NOT ONLY UNDERMINED THE GRAND JURY, IT CONTRADICTS THE GOVERNMENT'S THEORY AND THEIR FABRICATED STORY TO THE COURTS. MRS ONEAL RESPONSE DURING THIS ILLEGAL INTERROGATION FROM THE GOVERNMENT SHOWS AND PROVES THE GOVERNMENT DECEPTION, EXPOSE THEIR PERJURY, AND SUPPORT THE PLAINTIFF'S INNOCENCE. I ALSO ADDED MRS. DEBORAH ONEAL'S NOTARIZED STATEMENT AND MR BRIAN WADDELL'S NOTARIZED STATEMENT.   THEY BOTH ESPOND ON THE INCIDENT OR ANY 3RD PARTY LETTER FROM THE PLAINTIFF.

THE PLAINTIFF ADDS THE COURT ORDER FROM HONORABLE JUDGE HUVELLE (EXHIBIT 10) AND THE ILLEGAL DC JAIL SEARCH AFFIDAVIT VIOLATING (FRANKS V. DELAWARE) (EXHIBIT #11)

DURING MR JONES'S CRIMINAL CASE DURING THE SUPPRESSION OF MR JONES' CELL SEARCH, THE COURTS GRANTED THE SUPPRESSION OF THE ILLEGAL ATTAINED INFORMATION FROM THE NOVEMBER 23, 2005 CELL SEARCH. WITH ALL OF THESE EXHIBITS, FACTS AND EVIDENCE, THE PLAINTIFF WILL CHARGE THE GOVERNMENT WITH VIOLATING CONSTITUTIONAL RIGHTS, OUTRAGEOUS CONDUCT, PERJURY AND PROSECUTORIAL MISCONDUCT. DEFENDANT RACHEL LIEBER'S OVERZEALOUS CONDUCT DECEIVED THE DC JAIL

ADMINISTRATION, SPEED ON THE PLANTIFF'S DEFENSE
BEING VINDICTIVE, DENIED THE PLAINTIFF ACCESS TO
COURT, WAS SELECTIVE PROSECUTION, ABUSE OF
AUTHORITY OF AN OFFICER OF THE LAW BY PUTTING
HERSELF ABOVE THE LAW, VIOLATING THE LAW, BY STEPPING
OUT OF THE PROTECTION OF THE LAW AND OUT OF THE
REALM OF AN ASST. U.S. ATTORNEY, TO AN INVESTIGATED
CIVILIAN. RACHEL LIEBER VIOLATED NUMEROUS CODES
OF PROFESSIONAL CONDUCT. FORGETTING SHE'S JUST A
GOVERNMENT LAWYER NOT A HONORABLE JUDGE OR
COURT. THE PLAINTIFF SUFFERED MANY DAYS OF MENTAL
ANGUISH, STRESS, DEPRESSION AND PHYSICAL PAIN
BECAUSE OF RACHEL LIEBER AND PARTIES OUTRAGEOUS
CONDUCT.

THE PLAINTIFF WOULD LIKE TO ADD JOHN BEVINGTON
SPECIAL AGENT STEVE NAULE AND SPECIAL AGENT JOHN
SNOW TO THE CIVIL SUIT. (EXHIBIT #12) SHOWS AND
MENTIONS JOHN BEVINGTON BEING PART OF THE DC JAIL
CELL SEARCH ON NOVEMBER 23, 2005. ALSO TO ADD THAT
THE GOVERNMENT HAD AGENTS SEARCH, ON DECEMBER 2, 2005,
THE DAY THE PLAINTIFF WAS PLACED IN TOTAL SEPARATION
STATUS IN S-1 UNIT, MAXIMUM SECURITY, THE CELL.
THE OFFICER IN CHARGE OF THE UNIT AND THE PLAINTIFF'S
CELL MATE CAN TESTIFY THE AGENTS SEARCHING THE PLAINTIFF'S
CELL ON DECEMBER 2, 2005 WITHOUT THE PLAINTIFF'S
PRESENTS AND THE AGENT HAD SEIZED PROPERTY WITHOUT
THE PLAINTIFF'S PERMISSION NOR BY PRESENTING OR

LEAVING A SEARCH WARRANT.

CERTIFICATE OF SERVICE

I CERTIFY THIS TO BE TRUTHFUL AND BEING SENT THROUGH INSTITUTIONAL MAIL ON MARCH 6, 2005.



U.S. Department of Justice
United States Attorney
District of Columbia

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

# FAX

| To: | Eduardo Balarezo, Esq | From: | Rachel Carlson Lieber |
|---|---|---|---|
| Fax: | (202) 783-5407 | Phone: | 353-8055 |
| Date: | December 5, 2005 | | |
| Re: | | | |
| Page(s): | 3| including cover | | |

COMMENTS:

## U.S. ATTORNEY FACSIMILE COMMUNICATION

**WARNING: Information attached to this cover sheet is U.S. Government Property. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited. Please notify the originator immediately to arrange for proper disposition.**



U.S. Department of Justice

Kenneth L. Wainstein
United States Attorney

*District of Columbia*

---

Judiciary Center
555 Fourth St., N.W.
Washington, D.C. 20530

December 5, 2005

Eduardo Balarezo, Esq.
400 5th Street, N.W., #300
Washington, DC 20001

    Re:   <u>United States v. Antoine Jones, et. al</u>, 05-386 (ESH)
              Jail cell search results

Dear Eduardo:

      You called just now to inquire as to why your client had been placed in protective custody. I am writing to memorialize what I told you, and to attach copies of documents recovered from your client's cell in the execution of a search warrant on November 23, 2005. As I mentioned, in early November, we received information through various channels, including from agents wholly unrelated to this investigation, that your client was attempting to identify witnesses against him and "take care of them." Based on this information, we obtained copies of all calls your client made from the D.C. Jail. Then, based on some of the discussions he was having with individuals in the community, in conjunction with this source information, we obtained a search warrant for your client's cell, as noted above. Finally, based on the results of the jail cell search, we sought to have your client placed in protective custody, to ensure the safety of various individuals, several of whom remain unknown to the government.

      In addition, I am seeking to have all of your client's jail calls burned onto a CD for you. Once that is available, I will produce it to you, probably in a few days. I note that we have calls beginning on November 3, 2005, and continuing through November 20, 2005, and are in the process of obtaining the rest of his calls, from November 21, 2005, through December 3, 2005. As I mentioned, we sought to have your client placed in protective custody on November 23, 2005, the day we recovered the disconcerting materials from his cell, however, for reasons which remain a mystery, this was not done, and we again requested his separation on December 2, 2005, when we learned that he was still in population.

Please feel free to call me with any follow-up questions, once you've had a chance to review the enclosed.

Sincerely,

Rachel Carlson Lieber
Assistant United States Attorney

Enclosures

# DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS
## INITIAL CUSTODY CLASSIFICATION

Initial Classification Date: _1 / 1 / 10_

**I. IDENTIFICATION**

24/4/2

Inmate Name: _Jones_          4        _Pret Fel_

CSA

Most Serious Current Charge: _____

If Detainer/Warrant/Pending Case - Most Serious Charge: _____

**II. CUSTODY EVALUATION**

SCORE

**A. Severity of Current Offense** (Score the most severe current offense or detainer charge.)

| | |
|---|---|
| Lowest | 1 |
| Moderate | 3 |
| High | 5 |
| Greatest | 7 |

*3*

**B. Severity of Prior Criminal Convictions** (Score the most severe prior conviction in the past 10 years.)

| | |
|---|---|
| None | 0 |
| Lowest | 3 |
| Moderate | 5 |
| High | 7 |
| Greatest | |

*0*

**C. History of Escape or Attempts to Escape**

| | |
|---|---|
| No escapes or attempts to escape | 0 |
| Escape (or attempt) from low security or community corrections facility | 1 |
| Over 1 year ago | 3 |
| Within the past year | 5 |
| Escape (or attempt) from medium or high security OR any escape with actual or threatened violence | |
| Over 10 years ago | |
| Within the past 10 years | 7 |

*0*

**D. History of Institutional Violence** (Score the most serious documented incident in the past 10 years.)

| | |
|---|---|
| None | 0 |
| Behavior NOT involving a weapon or resulting in serious injury | 5 |
| Behavior involving a weapon or resulting in serious injury | 7 |

*0*

**MAXIMUM CUSTODY SCORE** (Add items A – D. Enter score at right.)
(If score is 10 or higher, inmate should be assigned to Maximum Custody.)

**SUBTOTAL SCORE (Add Items A – D)** _3_

SCORE

**E. Prior Felony Convictions** (in the past 10 years)

| | |
|---|---|
| None | 0 |
| One | 1 |
| Two or more | 2 |

*0*

**F. Drug/Alcohol History** (in the past 5 years)

| | |
|---|---|
| No use | 0 |
| Occasional or recreational use | 1 |
| Serious dependence/alcoholic/addict | 3 |

*3*

**G. Age**

| | |
|---|---|
| 24 or younger | 1 |
| 25 to 35 | 0 |
| 36 or older | -2 |

*-2*

**H. Education**

| | |
|---|---|
| High school diploma or GED | -1 |

*-1*

**I. Employment**

| | |
|---|---|
| Employed for at least 1 year at time of arrest | -1 |

*-1*

**SUBTOTAL SCORE (Add Items E – I)** _-1_

GOVERNMENT OF THE DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Central Detention Facility

MEMORANDUM

TO:            For the Record
SUBJECT:       Housing Request



I hereby waive Protective Custody. I understand that I may be placed in general population in any of the
D.C. Department of Correction facilities.

I hereby request the following Housing:

_____ Protective Custody          ___✓_____ General Population

If Protective Custody has been requested, give reason below: (Check One)

_____

__✓ I am not separated from anyone nor do I have any known enemies at the D.C. Detention Facility.

__ I am separated from or require separation from the following inmates:

Separatee Name_____

Reason:_____

    Staff Action:_____ ____General Population
                  _____Protective Custody-Refer to Housing Board
                  _____Separatee not at the Detention Facility

Separatee Name:_____

Reason:_____

    Staff Action:_____ ____General Population
                  _____Protective Custody-Refer to Housing Board
                  _____Separatee not at the Detention Facility

Separatee Name:_____
Reason:_____

    Staff Action:_____ ____General Population
                  _____Protective Custody-Refer to Housing Board
                  _____Separatee not at the Detention Facility

I have received an orientation relative to the rules and regulations of the D C Detention Facility and
have been advised of the housing arrangements at this facility. I request housing as indicated above.

Client Signature: Antoine Jones                241917          11-1-01

Approving Authority:_____ Arnell_____ CES
                                   Signature              Title

DEC 02 2005 16:26 FR VWAU          2023534896 TO ▨▨▨▨▨          P.01/02



**U.S. Department of Justice**
**United States Attorney**
**District of Columbia**

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*



| To: | ▨▨▨▨▨ | From: | ▨▨▨▨▨ |
|---|---|---|---|
| | DC Jail | | USAO/DC |
| | (202) ▨▨▨▨ | | (202) ▨▨▨▨ |

| Fax: | | Phone: | |
|---|---|---|---|

| Date: | December 2, 2005 |
|---|---|
| Re: | Request for Lockdown: Antoine Jones |
| Page(s): | 2 including cover |

**COMMENTS:**

Please ▨▨▨▨▨▨▨▨▨▨ immediately in ▨▨▨▨▨▨. If you have any questions, please call me on the telephone number listed above.

Thanks

---

## U.S. ATTORNEY FACSIMILE COMMUNICATION

*WARNING: Information attached to this cover sheet is U.S. Government Property. If you are not the intended recipient of this information, disclosure, reproduction, distribution, or use of this information is prohibited. Please notify the originator immediately to arrange for proper disposition.*

DEC 02 2005 15:28 FR UUAU                    TO                    P.02/02

# Memorandum

*United States Attorney*
*District of Columbia*

| Subject: | Date: |
|---|---|
| Request for Lockdown | December 2, 2005 |
| Antoine Jones | |
| DCDC 241912 | |

| To: | From: |
|---|---|
| DC Jail | USAO/DC |

AUSA ~~████████~~ has indicated in a previous request, dated November 23, 2005, that inmate Antoine Jones, DCDC 241912 ~~should placed immediately in lockdown~~ at the DC Jail. Please ~~ensure that Mr. Jones is locked down until further notice.~~

If you have any questions, please call me at (2) ~~████████~~ or ~~████████~~ at (2) ~~████████~~

Thanks

DEC 22 2005 12:42 FR VWAU ██████████TO ███████ P.02/11

# Memorandum

*United States Attorney*
*District of Columbia*

| Subject | Date: |
|---|---|
| Continuing Problems with Prisoner Antoine Jones, DCDC 241-912 | December 22, 2005 |

| To: | From: |
|---|---|
| Warden, District of Columbia Jail | ████████████ |
| | Assistant United States Attorney |

On ████████████, the United States Attorney's Office made a ████████████ ██████, that the aforementioned prisoner, Antoine Jones (DCDC 241-912) ████████ ████████, based on growing concerns that Mr. Jones was ████████████████████ ████████████ in his narcotics conspiracy case being prosecuted in United States District Court for the District of Columbia. ████████████, on ████████████ ████ ████████████████ while ████████████████ that he was ████████████ ███ ████████████████ which led ████████████████████████████. With the aid of members of ████████████████████████ I learned that Jones did, indeed, remain in population. Thus, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

████████████████████████████████ thirday, ███████████ 2005, ███ ████████████████████████████████████████████████████████ ████████████████████████ This completely undermines the purpose of his being in that ████████ - ████████████████████ Indeed, some of the basis for the government's concern regarding Jones's ████████████████████████ ████████████████████████████████████████████████████

I have attached copies of the most recent Department of Corrections call logs, ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

DEC 22 2005 12:42 FR VWAU                    TO ▮▮▮▮▮▮▮        P.03/11

The U.S. Attorney's Office and the F.B.I. are very concerned that Antoine Jones ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Please consider this memorandum a formal request for an immediate investigation into this situation, to include an examination of how these clear violations occurred, and more importantly, an immediate correction of the problem.

Please feel free to contact me at (202) ▮▮▮▮▮ (office) or (202) ▮▮▮▮▮ (cell), if you have any questions.

2

ORIGINAL

1

```
1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3      - - - - - - - - - - - - - -x
                                  :
4      UNITED STATES OF AMERICA    :
                                  :
5      VS.                         :
                                  :
6      LAWRENCE MAYNARD            :
                                  :
7      - - - - - - - - - - - - - -x

8

9
                              Grand Jury No. 04-1
10                            3rd & Constitution, N.W.
                              Washington, D.C.  20001
11
                              November 22, 2005
12

13         The testimony of STEPHANIE YANTA was taken in the

14   presence of a full quorum of the Grand Jury, commencing at

15   9:55 a.m., before:

16

17         RACHEL LIEBER
           Assistant United States Attorney
18
           JOHN V. GEISE
19         Assistant United States Attorney

20

21

22

23

24

25
```

12

1    you also intercept from time to time on the course of wire tap

2    legitimate business calls between Lawrence Maynard and Antoine

3    Jones --

4         A.    Yes.

5         Q.    -- about the nightclub itself?

6         A.    Absolutely.

7         Q.    Paying the rent?

8         A.    Yes.

9         Q.    Improvements to the club, that sort of thing?

10        A.    Yes.

11        Q.    Okay.  Now, since Mr. Jones was arrested, were you

12   actually present in court for some of the court appearances

13   that sort of flowed from the initial arrest of Mr. Jones and

14   this first group of individuals who were indicted?

15        A.    Yes, I was.

16        Q.    And do you -- personally, do you know who Lawrence

17   Maynard is by sight?    S t A R t

18        A.    Yes.

19        Q.    Okay.  Did you see Mr. Maynard in court?

20        A.    Yes, I did.

21        Q.    Okay.  How often did you see Mr. Maynard in court?

22        A.    Whenever Mr. Jones had an appearance, Mr. Maynard

23   was there.

24        Q.    Okay.  And finally, I want to direct your attention

25   to some recent telephone contact from the D.C. Jail.  Are you

1    aware that Antoine Jones is currently housed at the D.C. Jail?

2        A.    Yes, I am.

3        Q.    Okay.  And are you aware that we have received

4    recordings of telephone conversations by Mr. Jones at the D.C.

5    Jail?

6        A.    Yes.

7        Q.    Okay.  Has Mr. Jones -- and I want to confine --

8    well, let me say this.  Have we gotten in another shipment of

9    phone calls?

10        A.    Yes.                    Nov 21 2005

11        Q.    Okay.  Did we just get them very late last night?

12        A.    Yes, we did.

13        Q.    Okay.  So I want to direct your attention just to

14    the phone calls the first week of November, the first set of

15    phone calls that we have.  Are you aware of phone calls that

16    Mr. Jones made to a lady friend of his, giving her

17    instructions with respect to Lawrence Maynard?

18        A.    Yes.

19        Q.    Okay.  Tell the Grand Jury about that.

20        A.    Mr. Jones was talking to a female friend of his, and

21    during that conversation, he told this woman, "If you receive

22    any letters at your house that aren't addressed to you, don't

23    open them.  Give them to Lawrence.  He'll know what to do."

24        Q.    Okay.  Give me a second.  Okay.

25              BY MR. GEISE:

1      A.   That's correct.

2      Q.   And sometimes they'll also do it by face to face

3 meetings?

4      A.   Yes.

5      Q.   I don't have any other questions.

6           MS. LIEBER.   Do you all have questions for Special

7 Agent Yanta?

8           ~~GRAND JUROR.   I just have one.   Is it a common~~

9 ~~practice to monitor phone calls from when they're housed in~~

10 ~~jail?   Is that legal?~~

11          WITNESS.   ~~It is legal.~~   We actually have to

12 subpoena them, but ~~all the telephone calls in and out of the jail~~

13 ~~are recorded.~~

14          MS. LIEBER.   And let me just stop you there

15 because --

16          MR. GEISE.   When we, actually, when the agent's

17 gone, we'll gladly sort of lay out the legal stuff for you.

18 We can't testify, but we can tell you the legal background if

19 you're interested.

20          BY MS. LIEBER:

21      Q.   ~~And just for the Grand Jury's, sort of, edification,~~

22 ~~was there a particular reason why we, last week, got to obtain~~

23 ~~some jail telephone calls from Mr. Jones?~~

24      A.   ~~There was.   We had source information that Mr. Jones~~

25 ~~and his codefendant were actually, as we sort of termed as~~

16.

1    ~~killing the wagons, they were trying to figure out who may~~
2    ~~have snitched on them~~, and they were actually plotting to have
3    someone killed.

4        Q.    Now, this is based on -- we have not --

5        A.    Based on source information. ~~This is all based on~~
6    ~~source information, stuff that, you know, an individual who is~~
7    ~~reporting to law enforcement was hearing on the street~~. So,
8    you know, again, we don't know the, you know, the entirety of
9    the situation. However, ~~it was enough to~~, you know, ~~flag~~, you
10    know, ~~not only law enforcement~~, but also, you know, ~~the~~
11    ~~individual that may have been targeted~~, and, you know, ~~affect~~
12    ~~some other investigative techniques~~.

13        Q.    Is that -- just for the Grand Jury -- ~~is that what~~
14    ~~caused investigators to move quickly to try to obtain~~ --

15        A.    Yes.

16        Q.    -- those jail calls?

17        A.    Yes.

18        MS. LIEBER.    Any others?  Okay.  Thanks.

19        GRAND JUROR.    Thank you for coming.

20        WITNESS.    Thank you.

21        (Whereupon, at 10:12 a.m., the witness was excused
22    and subsequently recalled at 10:20 a.m.)

23        GRAND JUROR.    Yeah, just one quick clarification,
24    please.  At the time that the van was stopped, what was the
25    provocation for the van being stopped?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - x
                            :
UNITED STATES OF AMERICA    :
                            :
     vs.                    :   Criminal No. 05-0417
                            :
LAWRENCE MAYNARD            :
                            :   Washington, D.C.
- - - - - - - - - - - - - - x   November 29, 2005
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE ALAN KAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:        RACHEL CARSON-LEIBER, ESQ.
                           Assistant United States Attorney

For the Defendant:.        EDWARD SUSSMAN, ESQ.
                           Federal Public Defender Service

**Proceedings recorded by the Court, transcript produced by
Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C.  20005, 202-347-5395**
M9929/bf

1  him at that location -- he was, as I said, sort of an

2  intermediary and a point of contact between Mr. Jones and

3  sort of the -- you know, that's the pattern, is Mr. Jones

4  collects money, goes out to the stash house, gets a large

5  quantity -- kilogram quantities of cocaine, and then goes

6  and makes his rounds and drops off some of these drugs,

7  and on occasion the -- you know, it's our belief that when

8  he says that he's leaving "it" or "that stuff" or "the

9  bag" or whatever it is, "with Maynard" or, "Go get that

10  from Maynard," that sort of thing, that's the connection

11  of Mr. Maynard to the stash location.

12        Finally, I would just say, with respect to

13  detention, since Mr. Jones and that initial wave of

14  defendants were locked up, the Government has come into

15  possession of some intercepted telephone calls from the

16  jail, from the D.C. Jail, by Antoine Jones to, in

17  particular, one of his girlfriends.

18        There are a few telephone calls with her and, to

19  be quite honest, we have not actually gotten through all

20  of the jail calls because they're voluminous, but in at

21  least two telephone conversations Mr. Jones tells this

22  particular girlfriend that in addition to the letters that

23  he's sending her that are personal in nature to her, that

24  in fact he's also in fact sending her letters that if she

25  gets any letters to her address but without her name on

1    them, with someone else's name on them, "just give them to

2    Lawrence, and Lawrence will know what to do with them."

3    So he's passing information out of the jail through a

4    conduit, a girlfriend, to get to Mr. Maynard.

5            In addition to that, a jail cell search warrant

6    was conducted last week on Mr. Jones's cell, and contained

7    therein was a letter from a different girlfriend

8    identifying people who she, I guess doing research on

9    other defendants that Mr. Jones was seeking, you know,

10   trying to find out what happened with their case, talking

11   about whether or not they might be cooperating, and in

12   fact also taken from Mr. Jones's jail cell was a list of

13   people it appears, and it's not labeled, you know,

14   "cooperators," but the list, it appears to be speculation

15   about who is actually cooperating against him.

16           And I think the totality of these circumstances

17   not only, what I would submit is Mr. Maynard's very high-

18   level role in what can only be described as a very

19   substantial narcotics trafficking enterprise prior to the

20   arrest of some of the original defendants, but also in the

21   time after those defendants had been arrested, the

22   implications of, you know, passing information to

23   Lawrence, "Lawrence will know what to do with it," in

24   conjunction with some, you know, some actual physical

25   evidence that was seized from the cell, that indicate at

1    least what certainly can be surmised as obstruction --

2    potential obstruction of justice implicating Mr. Maynard.

3            For all those reasons, the Government submits

4    that based also on the presumption that there are no

5    combination of conditions that would assure the safety of

6    the community if Mr. Maynard remains on the street.

7            THE MAGISTRATE JUDGE:  All right.  Thank you,

8    Ms. Leiber.

9            Mr. Sussman?

10           MR. SUSSMAN:  From the Court's questioning about

11    the Fort Washington address, I take it that perhaps the

12    Court heard some of the evidence in connection with this

13    case.  Okay -- because --

14           THE MAGISTRATE JUDGE:  A lot of -- with the

15    other Defendant --

16           MR. SUSSMAN:  Right, so I wondered how much

17    background the Court had --

18           THE MAGISTRATE JUDGE:  Yes, well.

19           MR. SUSSMAN:  -- just in terms of the dates.

20    Let me first begin, I think that it's significant that in

21    a proffer where the Government characterized my client as

22    the right-hand man, that my client is not in the initial

23    indictment.  It clearly tells me, and it should tell the

24    Court, that the Government at the time of the initial

25    takedown, for all the proffer, did not -- and I see no

1   could continue on in any fashion.

2        I don't know whether Mr. Jones is obstructing

3   justice or not from the jail cell, but there's certainly

4   nothing in Ms. Leiber's proffer that indicates that my

5   client is involved in any of that.  The mention of his

6   name may well be a function of the way the Government

7   indicted this case.  Those who aren't indicted are often

8   believed by those who are indicted that there's a reason

9   why they haven't been indicted.  And Mr. Jones may be

10  curious about Mr. Maynard exactly because he wasn't in

11  that first indictment.

12       In essence, while it's very difficult to deal

13  with a proffer, from my perspective, I think that the

14  proffer is sort of around the mark and not really hitting

15  the mark.  Whether Mr. Jones wants to reach out to

16  Mr. Maynard in any way has nothing to do with Mr. Maynard.

17  It has to do with Mr. Jones's intention.  And if there's

18  unfortunate communication, it's Mr. Jones's problem at

19  this point.  There's nothing that implicates Mr. Maynard

20  in any obstruction of justice or any attempt to obstruct

21  justice.

22       What we have here is, I think more importantly -

23  - let me deal with one factual matter.  Ms. Leiber makes a

24  lot about the April 27th stop or April stop, I don't know

25  -- in North Carolina, in which money is found in a hidden

1           MR. SUSSMAN:  No, I don't know how drugs get

2   from Texas to --

3           THE MAGISTRATE JUDGE:  I see.

4           MR. SUSSMAN:  But the shortest point would

5   certainly not be North Carolina, Durham, North Carolina,

6   which is my understanding of the place of the stop.

7           Regardless of that, I think that in any case in

8   which the Government has brought an indictment, there's

9   probable cause, what we really are focusing on, I think,

10  in the detention issue is the characteristics of the

11  individual.  You know, certainly there's nothing charged

12  in this case that indicates that my client was violent, in

13  possession of weapons, or is the Government's case so

14  exceedingly strong in the sense that they have no

15  surveillance of him actually being involved in a drug

16  transaction.

17          And I think when you look at personal

18  characteristics, what you see here is a 44-year-old man

19  with absolutely no criminal record, as I understand it, or

20  certainly no convictions.  He's been married 22 years.

21  His wife, who is in the courtroom, is a secretary, I

22  believe, for the Department of Defense.  He has a stable

23  home.  He's lived with his two teenage daughters in a home

24  he owns that was searched, as I said, where nothing was

25  found.  He's worked his whole life.  And when Levels lost

1   its alcohol license he went out and immediately got a job

2   as a delivery man for a janitorial supply place.  This is

3   a man who's worked his entire life at legitimate

4   employment.  And there's no allegation whatsoever

5   concerning any violent conduct or any weapons possession

6   or any use of weapons on the part of my client.

7        So notwithstanding, notwithstanding Government

8   evidence -- and there's always going to be some evidence

9   when you stand here and you argue for release -- I do

10  believe that this Court can fashion conditions that will

11  assure community safety.  I don't believe that the Court

12  has a serious concern about flight in a case of person

13  who's a lifelong member of this community.  What you

14  really are talking about, under the most onerous

15  restrictions or somewhat onerous restrictions, his conduct

16  can be monitored.

17       And I would believe that a home detention

18  situation, allowing him only to leave for purposes of

19  work, employment, and to try to keep a roof over his

20  family's head and keep their head above water here, is

21  perfectly appropriate in this situation.

22       I don't believe there's anything in this proffer

23  that says that the potential of dangerousness over someone

24  with absolutely no track record of danger or violent

25  conduct in his past can't be overcome.

1   initial arrests in the case.  Mr. Maynard was in Court all

2   day, every day, at all those appearances.  It's not like

3   Mr. Maynard has washed his hands of Mr. Jones in any of

4   his organizations.

5          So I think that to downplay that, why in

6   heaven's name would Mr. Jones not just send a letter to

7   Mr. Maynard at his address?  Why would he have to send it

8   through a conduit, a girlfriend -- not even his wife, but

9   his girlfriend?

10         And I will note also, Your Honor, that in other

11  intercepted jail calls Mr. Jones speaks at length with his

12  wife about Mr. Maynard.  And so if in fact he had some

13  information to pass to Mr. Maynard and he just couldn't

14  possibly get it to Mr. Maynard because he couldn't, gosh,

15  remember his address, he certainly could give it to his

16  wife and say, "Just tell Lawrence X, Y or Z," and in fact

17  he didn't.  What he did was he chose to go through a

18  surreptitious route to get information passed --

19  information out to Mr. Maynard, who was his right-hand

20  associate who was still out on the street.  Not actually

21  incarcerated.

22         And to the extent that Mr. Sussman wants to

23  argue that, you know, the Government must not have had

24  enough evidence to charge Mr. Maynard at the time of the

25  initial arrests, Your Honor, I won't get into the

1    strategic reasons why Mr. Maynard wasn't arrested at that
2    time, but it was for strategic reasons and I can submit to
3    Your Honor in the form of a proffer that we had all of
4    this evidence prior to the arrest of Mr. Jones and some of
5    these other colleagues, to arrest Mr. Maynard as well.

6        This was not information that developed after
7    the fact, but in fact information that we had in our
8    possession -- except for, you know, these jail calls and
9    jail letters.  But everything else we had in our
10   possession at the time, and for strategic reasons and sort
11   of capacity reasons, frankly, certain people had to get
12   arrested first and certain people are coming along in a
13   later wave, and I'm not going to get into the strategic
14   reasons beyond that, but we certainly had more than enough
15   information to arrest Mr. Maynard at the time.

16       And finally, with respect to the fact that
17   Mr. Maynard has no prior record, that's true.  I'm not
18   going to suggest that he has any prior convictions.  But
19   in fact, Your Honor, he's not accused of selling dime
20   rocks on a street corner where there are jumpouts all the
21   time.  He's accused of moving in very high-level
22   quantities and a very select -- nothing I didn't mention,
23   but Mr. Jones's investigation developed and since the
24   arrest has sort of confirmed and through the wire
25   interceptions has certainly confirmed that Mr. Jones ran a

The government may also argue that it had source information that Jones, through communications from his cell, was attempting to tamper with witnesses. For example, via letter dated December 5, 2005, AUSA Lieber informed counsel that

> As I mentioned, in early November, we received information through various channels, including from agents wholly unrelated to this investigation, that [Jones] was attempting to identify witnesses against him and 'take care of them.' Based on this information, we obtained copies of all calls your client made from the D.C. Jail.[1] Then, based on some of the discussions he was having with individuals in the community, in conjunction with this source information, we obtained a search warrant for your client's cell . . . .

(*See* Exh. 2 at 2). Although the government may have had this source information about Jones' alleged attempts to locate or intimidate witnesses, Horne failed to include this information on the Affidavit.

On the facts of this case, the underlying affidavit is entirely lacking in indicia of probable cause. *Leon* clearly and unequivocally states that when the affidavit itself is entirely lacking in indicia of probable cause, it cannot be said that the officer acted in good faith in relying on a warrant that issues. That is the precise situation we have in this case.

"All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir.2006) (en banc) (quoting *United States v. Anderson*, 453 F.2d 174, 175 (9th Cir.1971) (internal quotation marks omitted)). Where the affidavit itself lacks *all* indicia of probable cause, it would unduly undermine the foregoing rule to permit extrinsic indicia of probable cause to be presented through an unsworn, unrecorded oral colloquy. Related to the foregoing, the Constitution also requires that probable cause be established "by Oath or affirmation." If unsworn, unrecorded oral colloquies, which may not be

---

[1] Jones also moves to suppress these calls because, upon information and belief, the government did not obtain these calls pursuant to a lawfully authorized subpoena or warrant.

LAW OFFICE OF

# A. EDUARDO BALAREZO

400 FIFTH STREET, NW
SUITE 300
WASHINGTON, DC 20001

(202) 639-0999 (TEL)
(202) 783-5407 (FAX)

ADMITTED IN DC, MD & NY
LAWOFFICE@BALAREZO.NET

January 16, 2006

**Via Electronic Case Filing**
Rachel Lieber, Esq.
Assistant United States Attorney
Office of the United States Attorney for the District of Columbia
555 Fourth Street, NW
Washington, DC  20001

Re:    United States v. Antoine Jones
       Criminal No. 05-386(1) (ESH)

Dear Ms. Lieber:

I write to discuss certain issues concerning discovery in the above-captioned matter.

First, as you are aware, Jonathan Zucker, Esq. is no longer in this case.  Because he was acting as discovery coordinating counsel, I will take over that responsibility.  Please direct any and all future discovery productions to me.

Second, and specifically regarding Mr. Jones, and pursuant to applicable rules, statutes and caselaw, I request that you produce the following:

a.    copies of all documents seized from Mr. Jones' cell (you previously provided me with some copies and I want to confirm that you have produced all documents);

b.    copy of signed and executed affidavit in support of search warrant for Mr. Jones' cell;

c.    copies of all recordings of Mr. Jones' jail communications;

d.    copies of all documents and items seized from Mr. Jones' homes at 10870 Moore Street, Waldorf, MD and 12221 Brandywine Road, Brandywine, MD;

e.    copies of all documents and items seized from Mr. Jones' vehicles, or those registered to his wife, Denice Jones;

f.    unredacted copy of Detective Norma Horne's signed and executed Affidavit in Support of Search Warrant for the various vehicles searched

| | | Call Date/Time | N |
|---|---|---|---|
| <A HREF="508233.WAV">Play Recording</A> | <A HREF="508233.HTML">View Details</A> | 11/07/2005 19:18:49 | 30 |
| <A HREF="509170.WAV">Play Recording</A> | <A HREF="509170.HTML">View Details</A> | 11/08/2005 11:25:11 | 20 |
| <A HREF="509271.WAV">Play Recording</A> | <A HREF="509271.HTML">View Details</A> | 11/08/2005 12:11:29 | 30 |
| <A HREF="509328.WAV">Play Recording</A> | <A HREF="509328.HTML">View Details</A> | 11/08/2005 12:36:37 | 30 |
| <A HREF="509486.WAV">Play Recording</A> | <A HREF="509486.HTML">View Details</A> | 11/08/2005 13:36:14 | 20 |
| <A HREF="509532.WAV">Play Recording</A> | <A HREF="509532.HTML">View Details</A> | 11/08/2005 13:52:32 | 20 |
| <A HREF="508386.WAV">Play Recording</A> | <A HREF="508386.HTML">View Details</A> | 11/07/2005 21:06:45 | 20 |
| <A HREF="514691.WAV">Play Recording</A> | <A HREF="514691.HTML">View Details</A> | 11/11/2005 09:42:40 | 30 |
| <A HREF="514725.WAV">Play Recording</A> | <A HREF="514725.HTML">View Details</A> | 11/11/2005 09:58:42 | 30 |
| <A HREF="513453.WAV">Play Recording</A> | <A HREF="513453.HTML">View Details</A> | 11/10/2005 17:46:40 | 20 |
| <A HREF="513520.WAV">Play Recording</A> | <A HREF="513520.HTML">View Details</A> | 11/10/2005 18:05:01 | 20 |

| | | | |
|---|---|---|---|
| <A HREF="515282.WAV">Play Recording</A> | <A HREF="515282.HTML">View Details</A> | 11/11/2005 13:07:14 | 24( |
| <A HREF="515302.WAV">Play Recording</A> | <A HREF="515302.HTML">View Details</A> | 11/11/2005 13:10:36 | 24( |
| <A HREF="513806.WAV">Play Recording</A> | <A HREF="513806.HTML">View Details</A> | 11/10/2005 19:28:24 | 30: |
| <A HREF="514052.WAV">Play Recording</A> | <A HREF="514052.HTML">View Details</A> | 11/10/2005 21:14:15 | 30: |
| <A HREF="514151.WAV">Play Recording</A> | <A HREF="514151.HTML">View Details</A> | 11/10/2005 21:30:57 | 30: |
| <A HREF="514249.WAV">Play Recording</A> | <A HREF="514249.HTML">View Details</A> | 11/10/2005 21:47:23 | 30: |
| <A HREF="518480.WAV">Play Recording</A> | <A HREF="518480.HTML">View Details</A> | 11/12/2005 18:26:33 | 30: |
| <A HREF="518496.WAV">Play Recording</A> | <A HREF="518496.HTML">View Details</A> | 11/12/2005 18:43:08 | 30: |
| <A HREF="518576.WAV">Play Recording</A> | <A HREF="518576.HTML">View Details</A> | 11/12/2005 18:55:59 | 30: |
| <A HREF="518630.WAV">Play Recording</A> | <A HREF="518630.HTML">View Details</A> | 11/12/2005 19:12:22 | 30: |
| <A HREF="518695.WAV">Play Recording</A> | <A HREF="518695.HTML">View Details</A> | 11/12/2005 19:28:19 | 30: |
| <A HREF="518831.WAV">Play | <A HREF="518831.HTML">View | 11/12/2005 | 30: |

| | | | |
|---|---|---|---|
| Recording</A> | Details</A> | 20:59:11 | |
| <A HREF="518921.WAV">Play Recording</A> | <A HREF="518921.HTML">View Details</A> | 11/12/2005 21:16:43 | 24( |
| <A HREF="519016.WAV">Play Recording</A> | <A HREF="519016.HTML">View Details</A> | 11/12/2005 21:33:46 | 30: |
| <A HREF="519112.WAV">Play Recording</A> | <A HREF="519112.HTML">View Details</A> | 11/12/2005 21:50:34 | 30: |
| <A HREF="519431.WAV">Play Recording</A> | <A HREF="519431.HTML">View Details</A> | 11/13/2005 09:13:55 | 30: |
| <A HREF="519455.WAV">Play Recording</A> | <A HREF="519455.HTML">View Details</A> | 11/13/2005 09:36:27 | 30: |
| <A HREF="519499.WAV">Play Recording</A> | <A HREF="519499.HTML">View Details</A> | 11/13/2005 10:13:14 | 24( |
| <A HREF="520270.WAV">Play Recording</A> | <A HREF="520270.HTML">View Details</A> | 11/13/2005 14:09:27 | 30: |
| <A HREF="522322.WAV">Play Recording</A> | <A HREF="522322.HTML">View Details</A> | 11/14/2005 16:54:41 | 30: |
| <A HREF="522417.WAV">Play Recording</A> | <A HREF="522417.HTML">View Details</A> | 11/14/2005 17:44:54 | 30: |
| <A HREF="523524.WAV">Play Recording</A> | <A HREF="523524.HTML">View Details</A> | 11/15/2005 09:32:29 | 30: |
| <A HREF="523553.WAV">Play Recording</A> | <A HREF="523553.HTML">View Details</A> | 11/15/2005 09:55:49 | 30: |
| <A | <A | | |

| | | | |
|---|---|---|---|
| HREF="522978.WAV">Play Recording</A> | HREF="522978.HTML">View Details</A> | 11/14/2005 21:06:22 | 20: |
| <A HREF="523063.WAV">Play Recording</A> | <A HREF="523063.HTML">View Details</A> | 11/14/2005 21:25:24 | 30: |
| <A HREF="523147.WAV">Play Recording</A> | <A HREF="523147.HTML">View Details</A> | 11/14/2005 21:41:46 | 30: |
| <A HREF="524011.WAV">Play Recording</A> | <A HREF="524011.HTML">View Details</A> | 11/15/2005 13:33:18 | 30: |
| <A HREF="524051.WAV">Play Recording</A> | <A HREF="524051.HTML">View Details</A> | 11/15/2005 13:49:37 | 30: |
| <A HREF="523223.WAV">Play Recording</A> | <A HREF="523223.HTML">View Details</A> | 11/14/2005 21:59:05 | 30: |
| <A HREF="527663.WAV">Play Recording</A> | <A HREF="527663.HTML">View Details</A> | 11/17/2005 11:21:38 | 30: |
| <A HREF="527746.WAV">Play Recording</A> | <A HREF="527746.HTML">View Details</A> | 11/17/2005 11:49:49 | 30: |
| <A HREF="526979.WAV">Play Recording</A> | <A HREF="526979.HTML">View Details</A> | 11/16/2005 21:40:20 | 30: |
| <A HREF="527076.WAV">Play Recording</A> | <A HREF="527076.HTML">View Details</A> | 11/16/2005 21:56:26 | 30: |
| <A HREF="527185.WAV">Play Recording</A> | <A HREF="527185.HTML">View Details</A> | 11/16/2005 22:13:53 | 30: |
| <A HREF="527277.WAV">Play Recording</A> | <A HREF="527277.HTML">View Details</A> | 11/16/2005 22:29:48 | 30: |

| | | | |
|---|---|---|---|
| <A HREF="527446.WAV">Play Recording</A> | <A HREF="527446.HTML">View Details</A> | 11/17/2005 09:39:26 | 30 |
| <A HREF="531065.WAV">Play Recording</A> | <A HREF="531065.HTML">View Details</A> | 11/19/2005 09:17:53 | 30 |
| <A HREF="531110.WAV">Play Recording</A> | <A HREF="531110.HTML">View Details</A> | 11/19/2005 09:34:41 | 30 |
| <A HREF="531168.WAV">Play Recording</A> | <A HREF="531168.HTML">View Details</A> | 11/19/2005 09:51:02 | 30 |
| <A HREF="531258.WAV">Play Recording</A> | <A HREF="531258.HTML">View Details</A> | 11/19/2005 10:16:13 | 30 |
| <A HREF="531314.WAV">Play Recording</A> | <A HREF="531314.HTML">View Details</A> | 11/19/2005 10:32:17 | 30 |
| <A HREF="531367.WAV">Play Recording</A> | <A HREF="531367.HTML">View Details</A> | 11/19/2005 10:48:05 | 30 |
| <A HREF="530852.WAV">Play Recording</A> | <A HREF="530852.HTML">View Details</A> | 11/18/2005 18:54:44 | 30 |
| <A HREF="535670.WAV">Play Recording</A> | <A HREF="535670.HTML">View Details</A> | 11/20/2005 22:00:20 | 30 |
| <A HREF="531543.WAV">Play Recording</A> | <A HREF="531543.HTML">View Details</A> | 11/19/2005 11:55:45 | 30 |
| <A HREF="534762.WAV">Play Recording</A> | <A HREF="534762.HTML">View Details</A> | 11/20/2005 17:18:18 | 30 |
| <A HREF="534842.WAV">Play | <A HREF="534842.HTML">View | 11/20/2005 | 30 |

| Recording</A> | Details</A> | 17:35:27 | |
|---|---|---|---|
| <A HREF="534928.WAV">Play Recording</A> | <A HREF="534928.HTML">View Details</A> | 11/20/2005 17:51:47 | 30 |
| <A HREF="535025.WAV">Play Recording</A> | <A HREF="535025.HTML">View Details</A> | 11/20/2005 18:11:57 | 30 |
| <A HREF="535486.WAV">Play Recording</A> | <A HREF="535486.HTML">View Details</A> | 11/20/2005 21:27:08 | 30 |
| <A HREF="535579.WAV">Play Recording</A> | <A HREF="535579.HTML">View Details</A> | 11/20/2005 21:43:40 | 30 |

On Thursday, January 26, 2006 I went to what I thought was going to be my appearing before the grand jury, but instead, I met with Rachel Lieber, Stephanie Yunta and Steve (don't know his last name...short stocky white male) and another agent (don't know her name...tall black female who came in towards the end of this meeting). We met in one of the witness rooms outside the grand jury hearing room. I got there around 1:05 p.m., for again, what I thought was a 1:30 p.m. appearance before the grand jury with no plans to meet with Ms. Lieber, but after said that she along with the agents wanted to talk to me before going into the grand jury, I agreed.

Stephanie asked me for my personal information (name, address, telephone number and occupation) which she and Ms. Lieber proceeded to write down along with everything else that I said. Ms. Lieber then said that I was there to testify before the grand jury and asked me if I knew what that entailed and my response was "not exactly". She went on to say that I would be asked questions regarding their investigation of Antoine Jones and that I was expected to tell the truth and if not it would result in my perjuring myself and lead to charges being brought against me. After her explanation of the grand jury process the conversation proceeded as follows:

Lieber: We have listened to a lot of phone conversations between you and Antoine and from those conversations it is clear that the two of you are romantically involved, but we are not here to judge you for that and we don't care about that. We want you to know that whatever is said in this room or before the grand jury is secret and will never disclosed to anyone. We will never tell anyone, but if you choose to tell someone that's your business, but we won't.

Lieber: Are you and Antoine romantically involved?

Answer: Yes.

Lieber: Where did you meet him?

Answer: We worked togther.

Lieber: Where?

Answer: P.G. Sports & Learning Complex.

Lieber: Where is that located?

Answer: Landover.

Lieber: How long have you known him?

Answer: Four years.

Lieber: How long after you met him did you become involved?

Answer: About one year.

Lieber: How did you find out about all of this and him being arrested?

Answer: On the news and in the newspaper.

Lieber: Did he tell you to send him all the articles from the paper and the internet because they didn't have the same thing that the paper was saying?

Answer: He did ask me to send him the newpaper articles, but I don't know what you mean when you say that he said they didn't have the same thing that the paper had?

Lieber: What did you send him?

Answer: The article from the paper and two other articles from the internet.

Lieber: Were you supposed to meet him the night before he was arrested?

Answer: No and I don't even know when he was arrested. When was he arrested?

Lieber: On Monday morning, October 25. Didn't you talk to him the night before he was arrested and was supposed to meet him?

Answer: Yes, I did talk with him on Sunday night for a few minutes and he then asked me if I had company and I said yes and he said okay. I will talk to you tomorrow and we hung up. I called him back later and talked to him briefly, but I wasn't supposed to meet him.

Lieber: He went out of town the week-end before he was arrested, where did he go?

Answer: Church.

Lieber: He went out of town to church?

Answer: Yes, he and his family attended church out of town.

Lieber: Nov. 3, which is the first call that Antoine made to you from jail...after you found out that he was alright and you went through the I miss you and things like that, why didn't you ask him what the hell was going on?

Answer: I don't know.

Lieber: I am having a hard time believing that your boyfriend that you love so much and believe is this great guy could be the leader of a drug ring that got caught with almost a million dollars, 100 kilograms of cocaine, guns and go to jail and you not act any different than you did, unless you knew what was going on. Again, since this was your boyfriend, we just couldn't figure out why you didn't respond as shocked, upset, angry or anything like that. This was the largest amount of cocaine seized in D.C. history and in the paper his name was listed first as the leader.

Answer: Again, I don't know. My response was what it was and I can't give an answer as to why it wasn't what you thought it should have been.

Lieber: Well, here is an example. we listened to another one of his calls with a female caller who said that she was shocked as ever and almost fell off her chair when she heard about this and we can't figure out why your response wasn't the same or somewhat similar to hers?

Answer: Again, what do you want me to say...I can't tell you why my response wasn't like that of someone else. I felt that if he wanted to tell me what was going on and why he was in jail, he would. I am not one to pry into other people's business.

Question: You mean that you had no idea that he was a drug dealer and that he was hanging out with all these Mexicans?

Answer: No, I didn't and I still don't. Can I just say something here? I have no knowledge of what it is that you are accusing him of and it looks as if the only way that you are going to believe me is if I say what it is that you want to hear and I won't do that because then I would be lying. I thought that a person was innocent until proven guilty anyway.

Lieber: Yeah, that's true.

Lieber: On another call (Nov. 6) that he made to you from jail, he told you that if any letters came to your house from him with someone else's name on it, you should hold it for Lawrence and he would get them from you.

Answer: That's not true. He never told me to hold anything for Lawrence.

Lieber: But didn't he did tell you that you might get some letters from him with somebody else's name on it and you said okay fine?

Answer: Yes.

Lieber: Did you ever get any letters addressed to someone else?

Answer: No, they were addressed to me with someone else's name on the back.

Lieber: Who's name was on it?

Answer: Bryant

Lieber: What did you do with it?

Answer: I gave it to Bryant.

**VOLUNTARY STATEMENT**
**(WITNESS)**

*Antoine Jones*

I, *Brian Waddell* , voluntarily give this statement without threat, promise or coercion. The events contained herein are true and correct to the best of my knowledge and belief. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purpose it may serve.

I am __48__ years of age, and I permanently reside at __3920 Brooklyn Ave brooklyn MD__
My resort address is ___SAME___ for the period of __2 yrs.__

At the end of November 2005 I got a call from a woman named Deborah. Deborah said that Antoine sent her a letter for me. I went to Bowie town center and meet with Deborah and got the letter. The Envolope had Deborahs name on the front and my name on the back. The letter explained that the police arrested Antoine, they got some money out of his jeep, the police went in his house and didn't find anything. He needed money for his defense lawyer, wanted me to check with the club promoters, Bo and Iviy, to see if they wanted to take over the club, he was saying that guys were out of jobs from the club, and to tell my family hello. The letter never contained any thhreats. Antoine never sent me any letters to give to anyone else, or to hold for someone to pick up.

I have read each page of this statement consisting of __1__ page(s), written by me (for me) each page of which bears my signature, and corrections, if any, bear my initials.

Dated at __6:30 pm__ , this __18__ day of __April__ __2006__

WITNESS:

**VOLUNTARY STATEMENT**
**(WITNESS)**

Antoine Jones

I, Deborah O'Neal , voluntarily give this statement without threat, promise or coercion. The events contained herein are true and correct to the best of my knowledge and belief. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purpose it may serve.

I am 44 years of age, and I permanently reside at 3904 Eldbridge terr Bowie MD

My resort address is SAME for the period of 1 year

Antoine called me one day and said he may send me some letters, with someone else's name on them, to hold the letters or give them to Lawrance, or Lawrance would get them. He never said give a letter to someone or do this or do that. Shortly after the conversation I got a letter addressed to me with Bryant's name on it. Also included was Bryants phone number. I called Bryant and he met me and picked up the letter. I never got any other letters addressed to anyone else, or to hold for anyone. None of the letters Antoine sent me contained any threats. I never known Antoine to threaten anyone. I never opened or Read the letter addressed to Bryant, and that letter had Bryants name on it.

I have read each page of this statement consisting of _____ page(s), written by me (for me) each page of which bears my signature, and corrections, if any, bear my initials.

Dated at 12:30 pm , this 12 day of April 2006

WITNESS:

Lieber: How did you contact this Bryant?
Answer: I called him?
Lieber: How did you know how to contact him?
Answer: Antoine gave me his phone number.
Lieber: How did he give you his phone number?
Answer: In a letter.
Lieber: What was in the letter with Bryant's name on it and why do you think that he asked you to deliver it?
Answer: I don't know what was in the letter because I didn't open it and I imagine that he asked me to give it to Bryant because he didn't know his address.
Lieber: When did this happen?
Answer: I don't know the date.
Lieber: Where does he live?
Answer: I don't know.
Lieber: Then how did you give it to him?
Answer: I met him on my way home from work one night.
Lieber: Where?
Answer: I had to stop at the drycleaners and he met me there.
Stephanie: What was he driving?
Answer: I don't know.
Stephanie: You mean you didn't see what he was driving?
Answer: I didn't say that I didn't see it. I just don't know what it was....I think it may have been an SUV.
Stephanie: What color was it?
Answer: I don't know, it was dark out and it may have been a dark color.

Ms. Lieber seems to be getting frustrated with me because I am not giving the answers that it appears that she wants and reiterated the consequences of perjury. She again said that she was having a hard time believing what I was saying.

At this time Stephanie pushed in front of me a sheet of paper that she got from Ms. Lieber which had pictures of twelve men on it and asked me if I recognized any of them.

I pointed to Antoine, Lawrence and Adrian. I pointed to someone who I thought might have been John and I said to her "is this John" and she said that they couldn't tell me whether it was or not and I said "it could be...I'm not sure". I did not know any of the other men in the pictures. If I can remember, there were three other black men, four that were some other race and one white.

Steve: Are you referring to John Adams?
Answer: I think that's his name, but I don't really know him like that. I may have seen him a few times at the club and I am not sure that's him.
Lieber: What was the relationship between Antoine, Lawrence, Adrian and John?
Answer: Adrian was co-owner of the club, Lawrence was the manager and John was a bar manager.
Lieber: In another phone call that Antoine made to you from jail, he said that "Mike is in here

crying and his wife is crying". Who is Mike?

Answer: His nephew.

Lieber: No, who is Mike that would be in there crying?

Answer: I think that you misunderstood what he said. I heard him say that "Mike is crying and his wife is crying, but not "Mike is in here crying".

Lieber: Why would he be talking about his nephew?

Answer: I don't know, but his nephew Mike is who he was referring to.

Lieber: What is Mike's last name?

Answer: Jones?

Lieber: So you are saying that you don't know Mike Huggins (sp?)?

Answer: No I don't.

Lieber: In another phone call that he made to you, when he was talking about selling the club to a guy from down near the waterfront, he said that "they tried to time this just right so they could stop the sale of the club?

Answer: I don't recall him saying that.

Lieber: Why did he leave his job at the gym and buy a night club?

Answer: I don't know.

Lieber: Why did he want to sell the club?

Answer: It took up to much of his time.

Lieber: After he sold the club, what was his plans, how was he going to make money?

Answer: I don't know. He did mention that he wanted to get into real estate.

Steve: Who is Derek?

Answer: His nephew.

Steve: What is his last name?

Answer: Jones.

Steve: So you don't know Derek who takes pictures at the club when they had cabarets?

Answer: Oh, okay, I do know him, but not personally. I had seen him at the club on a few occasions.

Steve: In a phone conversation with Antoine, did he tell you to collect some money from Derek?

Answer: No, he didn't.

Steve: Didn't he help you out by giving you some money at times and told you to collect some money from Derek?

Answer: No. Antoine was going to loan me some money, he asked me to call Derek on three way because Derek owed him some money and when Derek finally answered the phone Antoine told him to give me the money that he owed him.

Steve: When and where were you supposed to collect it?

Answer: I wasn't supposed to collect anything and nothing ever came of that phone conversation.

Steve: Did Antoine give you money to help get your car?

Answer: Yes.

Steve: How much did he give you?

Answer: $2,000.

Steve: Did he give you money regularly to help you out with bills?

Answer: No, but there were a few occasions where he loaned me money and I always paid him back.

Steve: When you worked together at the gym, who else worked on the shift with you?

Answer: What do you mean?

Steve: Did any of the other guys work on the shift with the two of you?

Answer: Yes, a shift wasn't just me and Antoine, a shift could be any where from six to ten people depending upon the day or time of day.

Steve: Who were some of the other guys on the shift?

(I didn't get to respond to this question because Ms. Lieber came back in the room and started talking, then after she realized that she had interrupted Steve, she apologized to him and his next question was)

Steve: Didn't your daughter date Adrian?

Answer: No, she never dated him.

Steve: Didn't she date him and know that he was a drug dealer?

Answer: She never dated him and knew nothing about him being a so-called drug dealer.

Lieber: Have you ever seen Antoine with any large sums of money?

Answer: I was with him once when he made a bank deposit of about $5,500 for the club.

Lieber: Was the deposit under $10,000?

Answer: Again, it was about $5,500.

Stephanie: At what bank?

Answer: SunTrust.

Lieber: Did he always carry large sums of money in his pockets?

Answer: I don't know. He sometimes had change for the bar at the club on nights they had events.

Lieber: Was it large bills?

Answer: I don't know.

Lieber: Did he go to the bank everyday?

Answer: I don't know.

Lieber: Did you know that the club was losing money hand over fist and was in big financial trouble?

Answer: No.

Lieber: Did you know that he was trying to sell the club?

Answer: Yes.

Lieber: When was the last big event at the club?

Answer: I don't know, but the last one that I knew of was the football party.

Lieber: Did you run some ads in the paper for the sale of the club?

Answer: Yes.

Lieber: Why did you do it instead of him doing it himself?

Answer: He asked me and I had no problem doing it.

Lieber: When and where was the last time you saw him?

Answer: I visited him the day after Thanksgiving?

Lieber: When was the last time that you talked to him?

Answer: I don't know....just before he couldn't make phone calls any more.

Lieber: How did you know that he couldn't make phone calls any more?

Answer: He told me in a letter.

Lieber: What did he tell you was the reason why he couldn't make calls?

Answer: Because he was in the hole?

Lieber: Did he tell you why he was in the hole?

Answer: No.
Lieber: When was the last time that you received a letter from him?
Answer: Monday or Tuesday.
(I got the feeling that they were surprised that he was getting mail or able to send out mail)

Lieber: Did he know that you had been subpoenaed to appear before the grand jury?
Answer: Yes.
Lieber: How did he find out?
Answer: I told him.
Lieber: How?
Answer: I told him in a letter.
Lieber: Did he tell you to call his lawyer?
Answer: Yes.
Lieber: Did you?
Answer: Yes.
Lieber: What did he tell you?
Answer: What he was charged with and that he could get life in prison.
Lieber: With the charge that we have against him now, he will get life in prison and we will be back in court again in March and we will have some more charges against him.
Lieber: In one of his phone calls to you, what did he mean when he said "I've got to be strong because if I break down, then it will be like a domino effect....what did he mean by that?
Answer: I didn't ask and I don't know.
Lieber: Why did he think that they were going to be released when they went back to court on December 19?
Answer: I don't know.
Lieber: In one of his earlier conversation with you he said that they let Adrian go, but then the Judge changed her mind, what was that about?
Answer: I don't know.
Lieber: Did he have a phone of yours?
Answer: Yes.
Lieber: Why?
Answer: Because I didn't want his phone bill going to his house with my numbers on it.
Lieber: So you gave him a phone so that he could talk to you on.
Answer: Yes.
Lieber: What was that phone number?
Answer: 240-893-2503.
Lieber: Why did he change his phone number?
Answer: I don't know.
Lieber: How did you find out that he had a new number?
Answer: He called me and told me.
Lieber: Had he changed his number before?
Answer: Yes.
Lieber: Just to let you know, you will be receiving a certified letter in the mail letting you know that you were on intercept from two of his phone numbers.

Steve: What kind of car does he drive?
Answer: A Jeep Cherokee and a Toyota Sequoia.
Steve: What color are they?
Answer: Goldish brown....something like that.
Question (I don't know who asked): Does he have a friend that lives in your neighborhood?
Answer: I don't if they are friends or not, but he did know a guy in my neighborhood.
Question: What is his name?
Answer: I think it's Kevin.

It is now about 2:35 and I asked them how much longer is this going to take? Ms. Lieber again leaves the room to see if the grand jury was ready for me. While she was out of the room Stephanie and Steve continued to watch me as if they were looking for some kind of sign or something. I then started to look back at Stephanie and then she asked me " who are you more mad at, him or us? My response was "I am not mad at him, I am not mad at anyone? She also asked me if I was still running? I said sometimes. I then asked her how did she know that I run. Her smirky response was "we heard about the 10k race on intercept". She asked me if I had taken the day off work and I said no and that I really needed to get back to work because I had things that I needed to get out before the end of the day. At this time, the tall back female agent entered the room and she asked me "in another phone conversation that you had with Antoine, what do you think that he meant when he said that his wife was the only one who stood by him when he was in prison? I said, I don't know what he meant and I didn't ask. She said "do you have any relatives that have ever be in prison" and I said "no", but why did you ask me that question? She responded by saying something to the effect that I would know how the system worked (I was puzzled and didn't know what she meant and I didn't ask for clarification).

Ms. Lieber re-entered the room and told me that it was my lucky day and that they weren't going to waste the grand jury's time, or their time or my time, but they had confirmed some things that they wanted to know by talking to me and that they were going to listen to the tapes some more and if they came across anything that I wasn't being truthful about then they would have to bring perjury charges against me. She also said that if they needed to talk to me again or decided that they wanted to bring me before the grand jury, they would re-subpoena me. I then asked if they would refrain from coming to my job again, and perhaps send it in the mail. Stephanie then said "no, we have to deliver it personally". I then said "I know that I can't tell you people what to do, but would you bring it to my house". Stephanie then said that "most people don't want them coming to their house". My response to that was "well, I am not most people and I would rather you come to my house instead of my job. Ms. Lieber then said that since they had my phone numbers, they could just call me. I said fine. When I left it was about 2:55 p.m.

I was just thinking about the question that Steve asked me about Antoine giving me money for my car. If it is true that they were only listening to my calls with him from September 2, 2005 to October 25, 2005, then how could they possibly know about something that happened back in February or March because I don't recall that being the subject of any of our conversations during the above stated time period.

The questions are not in any particular order and I tried to think of everything that I could remember that they asked me.

Westlaw.

221 F.2d 520
221 F.2d 520, 94 U.S.App.D.C. 415
**(Cite as: 221 F.2d 520)**

Page 1

▷Durbin v. United States,
C.A.D.C. 1954.

United States Court of Appeals District of Columbia
Circuit.
Andrew T. DURBIN, Appellant,
v.
UNITED STATES of America, Appellee.
No. 11866.

Argued Oct. 6, 1954.
Decided Nov. 4, 1954.

Prosecution for traveling in interstate commerce with
intent to avoid giving testimony before grand jury in
criminal proceeding. The United States District Court
for the District of Columbia, Alexander Holtzoff, J.,
entered judgment of conviction. Defendant appealed.
The Court of Appeals, Bazelon, Circuit Judge, held
that complaint for possible violations of laws could
not be construed as having 'charged' such violations
within statute prohibiting traveling in interstate
commerce to avoid giving testimony and indictment
was insufficient.

Conviction reversed and case remanded with
directions to dismiss.
West Headnotes
**[1] Obstructing Justice 282 ☜1**

282 Obstructing Justice
    282k1 k. Nature and Elements of Offenses in
General. Most Cited Cases
Statute prohibiting traveling in interstate commerce
to avoid giving testimony in certain criminal
proceedings must be strictly construed. 18 U.S.C.A. §
1073.

**[2] Obstructing Justice 282 ☜1**

282 Obstructing Justice
    282k1 k. Nature and Elements of Offenses in
General. Most Cited Cases
Under statute prohibiting traveling in interstate
commerce to avoid giving testimony in any criminal
proceedings in place in which commission of an
offense punishable by imprisonment in a penitentiary
is "charged", complaint for possible violations of

laws could not be construed as having "charged"
such violations and indictment alleging traveling in
interstate commerce with intent to avoid giving
testimony before grand jury in regard to such
complaint was insufficient. 18 U.S.C.A. § 1073.

**[3] Grand Jury 193 ☜36.4(2)**

193 Grand Jury
    193k36 Witnesses and Evidence
        193k36.4 Compelling Testimony or
Production; Subpoenas and Orders
            193k36.4(2) k. Indefiniteness or
Overbreadth; Motive and Purpose. Most Cited Cases
    (Formerly 193k36)
The United States Attorney's office is not a proper
substitute for the grand jury room and use of grand
jury subpoena to require witness, who was never
allowed to testify before grand jury, to make several
trips to United States Attorney's office for
questioning was improper.

**\*520\*\*415** Mr. Rex K. Nelson, Washington, D.C.,
with whom Messrs. Eugene X. Murphy and James K.
Hughes, Washington, D.C., were on the brief for
appellant.
Mr. John D. Lane, Asst. U.S. Atty., Washington,
D.C., with whom Messrs. Leo A. Rover, U.S. Atty.,
and William Hitz and Lewis A. Carroll, Asst. U.S.
Attys., Washington, D.C., were on **\*521** the brief for
appellee. Mr. William J. Peck, Asst. U.S. Atty.,
Washington, D.C., at the time the appeal was
docketed, also entered an appearance for appellee.

Before EDGERTON, WILBUR K. MILLER, and
BAZELON, Circuit judges.
BAZELON, Circuit Judge.
Appellant was convicted by the District Court, sitting
without a jury, upon an indictment under § 1073 of
Title 18 U.S.C. That section provides in pertinent
part:

'Whoever moves or travels in interstate or foreign
commerce with intent * * * (2) to avoid giving
testimony in any criminal proceedings in such place
in which the commission of an offense punishable by
imprisonment in a penitentiary is charged, shall be
fined * * * or imprisoned * * *, or both. (June 25,
1948, ch. 645, § 1, 62 Stat. 755)'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.2d 520
221 F.2d 520, 94 U.S.App.D.C. 415
**(Cite as: 221 F.2d 520)**

The indictment alleges that appellant 'traveled in interstate commerce * * * with intent to avoid giving testimony before the grand jury in the United States District Court for the District of Columbia in a criminal proceeding entitled 'In Complaint Made by E. L. Wilkinson, For Possible Vio. 18 U.S.C. 371, 202, 872'**416 (relating to extortion and bribery) in which proceeding the commission of an offense punishable by imprisonment in a penitentiary was charged.'[FN1]The record does not disclose whether the grand jury proceeding referred to was instituted upon a formal written complaint, and, if it was, whether such complaint made sworn charges.

[1][2] The primary question posed on this appeal is whether that complaint, which is merely described in the present indictment as 'Complaint * * * For Possible Vio(lations of laws),' may be construed as having 'charged' such violations within the meaning of § 1073. We think no such construction is permitted by the language of this criminal statute which must be strictly construed.[FN2]Moreover, this view is fortified by the Supreme Court's definition of a criminal charge in United States v. Patterson. There, although not in connection with the statute we construe here, the Court said:

'A criminal charge, strictly speaking, exists only when a formal written complaint has been made against the accused, and prosecution initiated. It is true the popular understanding of the term is 'accusation,' and it is freely used with reference to all accusations, whether oral, in the newspapers, or otherwise; but, in legal phraseology it is properly limited to such accusations as have taken shape in a prosecution. In the eyes of the law, a person is charged with crime only when he is called upon in a legal proceeding to answer to such a charge. Mere investigation by prosecuting officers, or even the inquiry and consideration by examining magistrates of the propriety of initiating a prosecution, do not, of themselves, create a criminal charge. * * *'[FN3]

The only case cited by the Government to support its contrary view is clearly distinguishable. In that case, Hemans v. United States, the proceeding in question was instituted upon a warrant, which was issued by a judge acting as a one-man grand jury, and which 'charged the commission of a felony by the twenty-eight individuals named in it.'[FN4]

Although our determination that the indictment is fatally defective is dispositive**522 of this appeal, another matter disclosed by the record requires notice. This matter, which involves certain conduct of the United States Attorney's office, took place before the incumbency of the present United States Attorney.

On December 10, 1951, appellant received a subpoena to appear the following morning before the grand jury to testify concerning the matter of the Wilkinson complaint referred to above. At the direction of the Assistant United States Attorney, to whom appellant reported as requested in the subpoena, appellant appeared at the United States Attorney's office on December 10, 11, 12 and 17. Appellant was never taken before the grand jury, which recessed on December 18. Instead, appellant was taken each time to the office of the United States Attorney where he was questioned by the Assistant or agents of the F.B.I., or both. As a result of this questioning, he gave two written statements which they prepared. At the trial which culminated in the conviction now on appeal, the Assistant admitted that the reason he did not take appellant before the grand jury was because he was not satisfied with appellant's statement.[FN5]**417 He also testified that he 'never gave (appellant) permission to leave the city except if he should ask my permission to do so and obtain that permission * * *.' It is quite apparent that the Assistant thought the grand jury subpoena empowered him to restrain appellant's movements indefinitely, or at least until appellant made a statement which satisfied him; and this despite the fact that the grand jury recessed.

[3]'The Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. They recognize the primary and nearly exclusive role of the Grand Jury as the agency of compulsory disclosure.'[FN6]They do not recognize the United States Attorney's office as a proper substitute for the grand jury room and they do not recognize the use of a grand jury subpoena, a process of the District Court, as a compulsory administrative process of the United States Attorney's office.[FN7]

It was clearly an improper use of the District Court's process for the Assistant United States Attorney to issue a grand jury subpoena for the purpose of conducting his own inquisition. Nor is such use excusable upon the mistaken notion that a member of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.2d 520
221 F.2d 520, 94 U.S.App.D.C. 415
**(Cite as: 221 F.2d 520)**

the United States Attorney's staff has the duty to be satisfied with what the witness will tell the grand jury before he allows the witness to testify before it, and may therefore use the subpoena as an oppressive tool to achieve such satisfaction.

The present conviction is reversed and the case remanded to the District Court with directions to dismiss the indictment.

So ordered.

> FN1. We merely note in passing that no indictment based on any complaint by E. L. Wilkinson was ever returned.

> FN2.United States v. Halseth, 1952, 342 U.S. 277, 280, 72 S.Ct. 275, 96 L.Ed. 308;France v. United States, 1897, 164 U.S. 676, 682-683, 17 S.Ct. 219, 41 L.Ed. 595.

> FN3. 1893, 150 U.S. 65, 68, 14 S.Ct. 20, 21, 37 L.Ed. 999.

> FN4.6 Cir., 1947, 163 F.2d 228, 236.

> FN5.'Q. The Grand Jury was in session during the course of these dates that you have testified, were they not? A. (Assistant United States Attorney) The Grand Jury was in session through the 18th of December.

'Q. And you didn't take him before the grand Jury? A. Did not.

'Q. And the reason you didn't take him before the Grand Jury is that you were not satisfied with his statement, isn't that true? A. That is correct.'

Appellant testified that when he reported to the Assistant United States Attorney on December 12, the Assistant 'said that he didn't want to use me as a witness at this time, (and directed) the two FBI agents, to take me to his office and see whether I had a better memory than the day or two before.'

> FN6.United States v. O'Connor, D.C.Mass. 1953, 118 F.Supp. 248, 250-251.

> FN7.In re National Window Glass Workers, D.C.N.D.Ohio 1922, 287 F. 219, 225.

C.A.D.C. 1954.
Durbin v. U.S.
221 F.2d 520, 94 U.S.App.D.C. 415

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



To navigate within the results and the documents use the buttons below.

# Rule 17. Subpoena
# Title IV. Arraignment and Preparation for Trial
# Federal Rules of Criminal Procedure

**(a) Content.** A subpoena must state the court's name and the title of the proceeding, include the seal of the court, and command the witness to attend and testify at the time and place the subpoena specifies. The clerk must issue a blank subpoena-signed and sealed-to the party requesting it, and that party must fill in the blanks before the subpoena is served.

**(b) Defendant Unable to Pay.** Upon a defendant's ex parte application, the court must order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense. If the court orders a subpoena to be issued, the process costs and witness fees will be paid in the same manner as those paid for witnesses the government subpoenas.

**(c) Producing Documents and Objects.**
**(1) *In General.*** A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

**(2) *Quashing or Modifying the Subpoena.*** On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.
**(d) Service.** A marshal, a deputy marshal, or any nonparty who is at least 18 years old may serve a subpoena. The server must deliver a copy of the subpoena to the witness and must tender to the witness one day's witness-

*william christian v. united states*

A subpoena may be resisted where the grand jury acts without authority, where the subpoena seeks information unrelated to the grand jury's investigation, or where the subpoena endeavors to gather evidence primarily for another purpose. In re Grand Jury Proceedings (Schofield), 486 F.2d 85 (1973), aff'd after remand, 507 F.2d 963 (3d Cir. 1975); see also United States v. Moultrie, D.C.App., 340 A.2d 828, 832 n.2 (1975). The court may exercise its supervisory powers over criminal proceedings if it appears the government is acting in bad faith or in a manner which constitutes a purposeful abuse of the grand jury system. See In re Melvin, 546 F.2d 1, 5 (1976), aff'd after remand, 550 F.2d 674 (1st Cir. 1977); Durbin v. United States, 94 U.S.App.D.C. 415, 221 F.2d 520 (1954) (dictum).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

APR 2 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA,    )
)
)
)
v.    )    Criminal No. 05-0386 (ESH)
)
ANTOINE JONES, *et al.,*    )
)
Defendant.    )
)

## ORDER

Upon consideration of Defendant Jones' Motion for Modification of Conditions of

Detention [# 76], the government's response thereto [# 85] and supplemental filings [# 93, 96],

and defendant's Reply [# 94], as well as oral argument from both parties, it is hereby

**ORDERED** that the motion is **GRANTED** insofar as defendant should no longer be in

total lockdown, but the following conditions shall be imposed: the D.C. jail is to record

defendant's phone calls and monitor his incoming mail (with the exception of calls and mail

from his attorney, Eduardo Balarezo, and his investigator, Mark Glick); and defendant's social

visits shall be limited to his attorney, Eduardo Balarezo; his investigator, Mark Glick; and his

wife, Deniece Jones.

It is further **ORDERED** that defendant's Motion for Law Library Access [# 50], is

**DENIED** as moot.

*Ellen S Huvelle*

ELLEN SEGAL HUVELLE
United States District Judge

April 24, 2006

CC:    D.C. Jail

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

**MAY 0 5 2006**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|                              |     |
| ---------------------------- | --- |
| UNITED STATES OF AMERICA,    | )   |
|                              | )   |
|                              | )   |
|                              | )   |
| v.                           | )   |
|                              | )   |
| ANTOINE JONES, *et al.,*     | )   |
|                              | )   |
| **Defendant.**               | )   |
|                              | )   |

Criminal No. 05-0386 (ESH)

**ORDER**

Pursuant to the Court's Order of April 24, 2006 ("April 24 Order"), it is hereby

**ORDERED** that defendant Antoine Jones is to be placed forthwith in the general

population at the D.C. Jail, subject to the conditions set forth in the Court's April 24 Order.

ELLEN SEGAL HUVELLE
United States District Judge

May 5, 2006

CC:   D.C. Jail
     U.S. Marshal.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

Property and Cell of Antoine Jones
District of Columbia Department of Corrections
D.C. Jail, 1901 D Street, S.E.
Washington, D.C.

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: OS-63 M

(Further described below)

I ___Norma Horne_____ being duly sworn depose and say:

I am a(n)___Detective with the Metropolitan Police Department_____ and have reason to believe
(Official Title)
that ☐ on the person of or ☒ on the property or premises known as  (name, description and or location)
Property and cell of Antoine Jones, District of Columbia Department of Corrections, D.C. Jail, 1901 D Street, S.E,
Washington, D.C.

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be
searched)
Documents or records, as set forth more fully in Attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
evidence of attempted obstruction of justice, witness tampering, witness intimidation, ongoing attempts to conceal a drug
conspiracy

concerning a violation of Title __18__ United States Code, Section(s) _1510, 1512, 1513_, Title _21_ United States Code,
Sections 841 and 846 . The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.     ☒ YES  ☐ NO

Jack Geise
Narcotics 4th Floor USAO
(202) 616-9156

Signature of Affiant
Norma Horne, Detective
Metropolitan Police Department

Sworn to before me, and subscribed in my presence

_23 NOV 200_
Date                                          at Washington, D.C.

_____          _____
Name and Title of Judicial Officer              Signature of Judicial Officer

## ATTACHMENT A

1) Books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances;

2) Letters, notes, and other papers relating to the coverup of past distribution of controlled substances, including letters of instruction to non-incarcerated individuals;

3) Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances; and

4) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, photographs, personal telephone books, diaries, and identification documents.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF | ) | |
| THE UNITED STATES OF AMERICA FOR AN | ) | FILED UNDER SEAL |
| ORDER AUTHORIZING THE ISSUANCE OF A | ) | |
| SEARCH WARRANT FOR FOR THE ENTIRE | ) | |
| JAIL CELL AND PERSONAL PROPERTY OF | ) | |
| **ANTOINE JONES**, D.C. JAIL, 1901 D STREET | ) | |
| SOUTHEAST, WASHINGTON, D.C. | ) | |

## AFFIDAVIT

I, Norma Horne, am a police officer of the District of Columbia Metropolitan Police

Department (MPD), having been duly sworn, state:

## I. INTRODUCTION

I am an investigative and law enforcement officer of the United States and District of

Columbia who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in the Comprehensive Drug Abuse Prevention and Controlled Substances Act of

1970, Title 21 of the United States Code (USC), as amended and the Uniform Controlled

Substances Act, Title 48 of the District of Columbia Code as well as Title 18 offenses.

I am an officer of the District of Columbia Metropolitan Police Department and have

been so employed for over 14 years. I have received narcotics specialization training from the

Metropolitan Police Department Training Division, the United States Attorneys Office and gang

training from the Mid Atlantic Great Lakes Organized Crime Law Enforcement Network. I have

attended the Expert Witness class offered by the Major Narcotics Branch, MPD. I have also

received firearms trafficking and identifying an armed subject training from the Bureau of

Alcohol Tobacco and Firearms. I have been personally involved in numerous narcotics and

weapons investigations throughout the District of Columbia, with concentrated efforts in the

Northeast area of the city. I have worked in an undercover capacity during which I purchased

firearms and a controlled substance. As a result of these experiences and formal training, I am familiar with the actions, habits, traits and terminology utilized by the traffickers and abusers of controlled dangerous substances. I have prepared and participated in the preparation and execution of over two hundred search and arrest warrants. I also have testified as a witness in the Superior Court and United States District Court for the District of Columbia.

In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

Through instruction and participation in investigations, your affiant has become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that:(a) drug traffickers virtually never expressly refer to cocaine or other illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use electronic paging devices, commonly referred to as pagers or beepers, cellular telephones, digital telephones, and other communications devices to further their illegal activities by, among other

2

things, remaining in constant or ready communication with one another without restricting either party to a particular telephone or location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to pagers or telephones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the pager.

Throughout this investigation, your affiant has worked with other Special Agents (SAs) of the FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD) assigned to the Safe Streets Task Force. This affidavit is based on my personal knowledge derived from my participation in this investigation, as well as speaking with other law enforcement officers assigned to this investigation, and includes, but is not limited to, the following information: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; and (f) review of wire interceptions pertaining to the target telephone authorized by United States District Court Judge Paul L. Friedman on September 2, 2005, and extended on September 30, 2005, (g) debriefings of confidential informants; and review of intercepted telephone calls placed by **ANTOINE JONES** from the D.C. Jail.

3

It is a common practice of drug traffickers who are incarcerated to reach out to associates who remain in the community to continue their illegal drug trafficking activities while incarcerated, including attempts to influence witnesses and arrange for the concealing or destruction of evidence. Such outreach takes many forms, including telephone calls from the jail, and letters containing instructions regarding the manner in which to continue the business. It is also common practice for individuals who receive such letters to maintain them for a period of time, and to refer to the instructions contained therein.

Your affiant also knows from prior training and experience that inmates frequently maintain letters, notebooks, phone books, family photographs and other notations in their cell and among their personal property. Examination of this material can provide investigators with the identity of persons close to the inmate, including co-defendants and persons willing to commit criminal acts for the defendant. Inmates will also utilize the inner-jail mail system to correspond with other family members and friends, and in this correspondence, as well as in normal correspondence, will discuss or allude to criminal activity, often using slang or code.

Additionally, the affiant knows that if an inmate write on a pad, and then mails or destroys what he has written; chemical analysis of that pad can often reveal what was written.

Finally, your affiant also knows from training and experience that the D.C. Jail will frequently move inmates and/or their possession at a moments notice, both for administrative and security reasons. The location of any inmate and/or his property can be determined at any specific time through the Central Records Department of the D.C. Jail.

4

## LOCATION TO BE SEARCHED

The description of the following address was obtained through physical surveillance by your affiant and/or other law enforcement officers.

FOR THE ENTIRE JAIL CELL AND PERSONAL PROPERTY OF **ANTOINE JONES**, a black male, Date of Birth: February 25, 1960, SSAN: 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, FBI#: 901461KA2, D.C.D.C. # 241912, WHO IS CURRENTLY AN INMATE OF THE D.C. JAIL. LOCATED AT 1901 D STREET, SOUTHEAST, WASHINGTON, DC. THE EXACT LOCATION OF THE CELL OCCUPIED BY AND THE EXACT LOCATION OF ANY STORED PERSONAL PROPERTY WILL BE DETERMINED THROUGH THE D.C. JAIL'S RECORDS DEPARTMENT AT THE TIME OF THE EXECUTION OF THE SEARCH WARRANT.

## BACKGROUND OF THE INVESTIGATION

### A. **Prior to First Interception**

In late 2004, the FBI obtained information from a number of confidential sources that **ANTOINE JONES** was operating a large narcotics trafficking organization in the greater Metropolitan Washington, D.C., area and elsewhere. It was also learned that **JONES** operated almost exclusively with the assistance of his right-hand associate, **LAWRENCE MAYNARD**, one of the few people with whom he will deal directly. Further, investigation revealed that **ANTOINE JONES** was the sole proprietor of a nightclub named "LEVELS," located at 1960 Montana Avenue, N.E., Washington, D.C. Sources told Investigators that **ANTOINE JONES** used his business as a location where he often conducted his drug trafficking activities, including distributing kilogram quantities of cocaine and collecting substantial quantities of money, as well

5

as laundered drug trafficking proceeds through that nightclub. According to records on file with the District of Columbia Alcoholic Beverage Regulatory Agency (ABRA), MAYNARD is listed as the "A.B.C. manager" of the nightclub. Further, as set forth more fully *infra*, wire interceptions on JONES's cellular telephone confirm that JONES and MAYNARD have frequent contact on the telephone regarding LEVELS, much of the time confirming that they will meet at that club at some point each day. The confidential sources all reported that ANTOINE JONES maintained a discreet operation, and limited his contacts to individuals known to him personally, or introduced to him by trusted, well known associates.

According to information provided by several confidential sources, who were customers of JONES and MAYNARD, and who have provided reliable information throughout the course of this investigation, resulting in the seizure of in excess of 100 kilograms of cocaine and cocaine base, and in excess of $800,000, in related search warrants executed on October 24, 2005, MAYNARD undertakes many tasks on behalf of ANTOINE JONES's narcotics trafficking organization, including but not limited to being an intermediary and a point of contact between ANTOINE JONES and many of his drug suppliers and customers. For example, these sources report that JONES frequently changed his cellular telephone number in an effort to avoid detection by law enforcement; however, MAYNARD has retained his same cellular telephone for over two years. If these sources needed to get into contact with JONES to place an order for kilogram quantities of cocaine, they frequently would contact MAYNARD to get the current telephone number for JONES, who also has been known to use "burnout" or disposable cellular telephones.

6

Further, one of these reliable sources asserted that, based on its conversations with both

JONES and MAYNARD, JONES and MAYNARD traveled out of the Metropolitan

Washington, D.C., area on occasion, often near the end of each month, to obtain multiple-

kilogram quantities for cocaine for redistribution. While this source did not know precisely,

where JONES and MAYNARD traveled to pick up the narcotics, it recalled hearing JONES

state that they were "goin' down the road" and refer to "Carolina." The source further reported

that, while it was not aware of the specific identity of JONES's narcotics supplier, it recalled

JONES or MAYNARD mention narcotics coming from "the Mexicans" and "Texas."

The report of MAYNARD's role in JONES's drug-trafficking operation was confirmed

through various law enforcement means, including surveillance of JONES's nightclub

LEVELS, which revealed MAYNARD on the premises of the nightclub nearly every day during

the surveillance period, which began in January, 2005. This report regarding MAYNARD's

crucial role in the JONES drug-trafficking enterprise was further confirmed by a traffic stop of

MAYNARD on April 5, 2005. The Highway Interdiction Unit of the Durham, North Carolina

Police Department conducted a traffic stop of a 1997 Honda Odyssey mini-van bearing

Maryland tags 273M195, operated by MAYNARD and also occupied by DERRICK GORDON

in the vehicle front passenger seat. Their investigation revealed that this car was registered to

ANTOINE JONES, with a date of birth of February 25, 1960, and to one of his residences,

12221 Brandywine Road, Brandywine, Maryland. In the course of further investigation, the

interdiction unit canine alerted on the right rear passenger area of the mini-van. A search of the

mini-van revealed a hidden compartment in the van, which contained six white plastic Target

shopping bags, containing a total of $67,115.00 in U.S. currency, in various denominations, held

7

together by rubber bands. In addition, both **MAYNARD** and **GORDON** each had in their possession well in excess of $1,000.00, which totaled just under $5,000.00, between the two of them. When interviewed by the Interdiction Unit, **MAYNARD** and **GORDON** both denied any knowledge of the secret compartment and the money contained therein. The Honda Odyssey was impounded, the $67,115.00, was seized as evidence, **MAYNARD** and **GORDON** received a warning ticket, and then were released without additional charges.

**MAYNARD**'s role was finally confirmed by pen register information which was obtained by law enforcement, beginning in January, 2005, obtained through a court order issued in the United States District Court for the District of Columbia. Pen register data revealed suspicious contact by **MAYNARD** with a cellular telephone listed in what investigators believe to be a fictitious name, HENRY GARCIA, with a Texas area code, but listed to a P.O. box in Irvine, California, which has been implicated in several narcotics trafficking investigations being conducted by the F.B.I., the D.E.A., and other law enforcement agencies, several of which implicate cocaine trafficking originating in Mexico and elsewhere. Specifically, on April 5, 2005, the date of the North Carolina traffic stop, **MAYNARD's** cellular telephone received a call at approximately 2:17 p.m. from the HENRY GARCIA cellular telephone. In addition to this call from GARCIA to **MAYNARD** on April 5, 2005, pen register data shows three more calls from GARCIA to **MAYNARD**, two on March 25, 2005, and one on March 30, 2005. Finally, pen register data pertaining to (202) 538-3946, the telephone in use by **ANTOINE JONES**, reflects a telephone call from **ANTOINE JONES** to GARCIA on June 25, 2005. Based on (a) the number of narcotics-trafficking investigations into the P.O. Box used by GARCIA, (b) the implication of Mexico and Texas in those investigations, (c) information from

8

a reliable source that **ANTOINE JONES's** source of cocaine is "Texas" and "the Mexicans," and (d) the traffic stop of **MAYNARD** which revealed $67,100 in a hidden compartment in **ANTOINE JONES's** car, your affiant believes that these telephone contacts between **MAYNARD, JONES,** and **GARCIA** relate to illegal narcotics-trafficking activities, and that **MAYNARD** was engaged in these conversations on behalf of **JONES.**

### B. Wire Interception Period

On September 2, 2005, authorization for wire interception on a cellular telephone known to be used by **ANTOINE JONES** was granted by the Honorable Paul L. Friedman, Judge, District Court for the District of Columbia. Investigators quickly identified a core group of individuals believed to be involved in **JONES'** narcotics trafficking activities. Although the conversations were generally short and the language encrypted, Investigators began to see a clear pattern of conversations clearly suspicious in nature regarding "tickets, VIP tickets, flyers and math homework." Investigators ascertained that these conversations were related to the distribution of wholesale quantities of narcotics and/or money transactions.

Conversations mirroring the aforementioned continued into the second authorized period of wire interception which began on September 30, 2005, and continued until its termination on October 25, 2005. **JONES** and his drug-trafficking colleagues continued his use of the code "tickets" to reference large wholesale quantities of cocaine – frequently speaking of their need for various numbers of "tickets, VIP tickets" and, occasionally, "little tickets." Shortly after many of these phone calls discussing the need for a certain number of tickets, surveillance revealed **JONES** meeting with the person on the aforementioned calls, and handing over a plastic bag, which is the manner in which sources have indicated that **JONES** and his colleagues

9

exchange cocaine and money.

Wire interceptions further revealed the role of Texas suppliers in **JONES'** organization. To that end, Investigators identified three separate out of area telephone numbers believed to be involved in the narcotics supply chain which confidential sources told Investigators was "Mexicans" and/or "Texas." Throughout the course of this period, **JONES** had frequent contact with a number of Hispanic sounding males, with cellular telephones registered in what Investigators believed to be fictitious names. As a result, Investigators identified a location in Ft. Washington, Maryland, believed to be a stash house. **ANTOINE JONES** was surveilled at this location on numerous occasions during the interception period, often shortly after speaking with a Hispanic-sounding male on one of these out-of-area telephone calls, and indicating that he would meet with that individual within a designated period of time, for example "20 minutes." On numerous occasions, shortly after one of **JONES's** visits to the stash house in Ft. Washington, Maryland, **JONES** would arrange to meet with many of his suspected customers, in rapid succession.

Finally, wire interceptions revealed **JONES** on occasion telling other known drug-trafficking associates to get in touch with "Lawrence" to pick something up, or simply to "see Lawrence," who would take care of matters. While these conversations were encrypted, as were most of **JONES's** conversations that did not involve details of his legitimate nightclub business, based on the fact that such calls were frequently made with individuals who had no known connection to **LEVELS**, investigators believe that these calls referenced drug trafficking activity by **JONES, MAYNARD,** and their customers.

10

## C. October 24, 2005 Take Down

On this date, a number of sealed search warrants were executed at various locations throughout the greater Washington, D.C. area. A total of nine individuals were arrested, but **MAYNARD** was not among them. Of particular significance, recovered at the "stash location" at 9508 Potomac Drive in Ft. Washington, Maryland, Investigators recovered ninety-seven (97) kilograms of cocaine powder, three (3) kilograms of crack cocaine and $834,520.00 in US currency. Three Hispanic males were arrested at this location, two of whom were Mexican Nationals, and one of whom was identified seated in the passenger seat of **JONES's** Jeep Grand Cherokee in a photograph that was taken by a surveillance team. At other locations searched that day, smaller quantities of cocaine were found, for example, half-kilogram quantities, along with smaller quantities of cash, for example, $12,000.00, along with firearms, and narcotics packaging materials at several houses. Further, a gun was recovered from the office of **JONES's** nightclub **LEVELS,** and in excess of $69,000.00, in cash was recovered from **JONES's** Jeep Grand Cherokee.

## D. Intercepted Jail Telephone Calls

Over the course of his incarceration at the District of Columbia Jail, **JONES** has made numerous telephone calls, which were recorded by the Jail. Among those calls were several to **DEBORAH O'NEAL,** who has been identified both in calls intercepted on the wiretap and in calls intercepted from the Jail, as a romantic interest of **JONES.** In one such telephone call, on November 3, 2005, at approximately 9:16 p.m., **JONES** told **O'NEAL** that he had sent her a few letters from the Jail. In particular, he mentioned that when she gets letters with another name on them, that she should hold onto the letters and give them to "Lawrence" because "Lawrence"

11

knows what to do with them. Later in this approximately 15 minute telephone call, JONES reminds O'NEAL that when she gets letters without her name on them, that she should just hold them. In a later call to O'NEAL, on November 6, 2005, at approximately 11:57 a.m., JONES and O'NEAL discuss "Lawrence" at some length. JONES told O'NEAL to tell "Lawrence" to write to him and let him know what was going on, because he doesn't want to be "in the blind." Investigators believe that since he has been incarcerated, JONES has written letters to other members of his illegal narcotics-trafficking operation, but has sent them to O'NEAL's house, who in turn will give them to MAYNARD, in an effort to conceal his communications with those individuals. Specifically, investigators believe that JONES has sent letters to MAYNARD via O'NEAL, which speak of the details of ongoing narcotics trafficking, including the possible concealment of evidence, and the continuation of the business, and that MAYNARD has kept these letters in his possession, as is common in the illegal narcotics trade.

Further, in numerous conversations with his wife, Deniece Jones, ANTOINE JONES is heard urging her to get into contact with MAYNARD, to tell him that JONES needs to speak with him. On a few occasions, JONES asks his wife to call MAYNARD on her cellular telephone, while JONES's call from the Jail is underway on the landline. JONES repeatedly tells his wife to tell MAYNARD to come out to the Jail to visit him. Based on these calls, and on MAYNARD's identified role in JONES's narcotics-trafficking operation, investigators believe that MAYNARD has evidence pertaining to narcotics-trafficking in his possession, to include letters from ANTOINE JONES.

12

## PROBABLE CAUSE FOR INDIVIDUAL LOCATION

1. **Jail Cell and personal property of ANTOINE JONES** (a black male, Date of Birth: February 25, 1960, SSAN:  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, FBI#:  901461KA2)

**ANTOINE JONES** is currently an inmate of the D.C. Jail located at 1901 D Street, Southeast, Washington, D.C.  The exact location of the cell occupied by and the exact location of any stored personal property will be determined through the D.C. Jail's Records Department at the time of the execution of the search warrant.

## OFFENSES

Attempted obstruction of justice and witness tampering, in violation of 18 U.S.C. § § 1510, 1512, and 1513, and violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., including: (a) the possession with intent to distribute and distribution of controlled substances, in violation of Title 21 United States Code (USC) § 841(a)(1); and (b) conspiracy to commit such offenses, in violation of  21 U.S.C. § 846.

## CONCLUSION

Wherefore, based upon the facts and circumstances related above and my experience as a Special Agent of the FBI, I believe that there is probable cause to believe that the following articles are present at the subject premises:

1) Books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances;

2) Letters, notes, and other papers relating to the coverup of past distribution of controlled substances, including letters of instruction to non-incarcerated individuals;

3) Personal books and papers reflecting names, addresses, telephone numbers, and

13

other contact or identification data relating to the distribution of controlled

substances; and

4) Items of personal property that tend to identify the person(s) in residence,

occupancy, control, or ownership of the premises that is the subject of this

warrant, including but not limited to canceled mail, photographs, personal

telephone books, diaries, and identification documents.

I swear and subscribe to the information contained in the Affidavit:

NORMA HORNE
Detective
Metropolitan Police Department

Sworn to and subscribed before me
this ___ day of _____ 2005 in
the _____

UNITED STATES MAGISTRATE JUDGE

14



Beverly Johnston
191B Village Green Dr.
Hyattsville MD 20785

Antoine Jones
241-912
1901 D St SE
Washington DC
20003



USA
37

Hey It's me Beverly. Miss You. I guess things didn't work out like I wanted them too. I receive your letter Tuesday 8th. I waited all night hoping you where going to knock on my door Wedsenday night. But coming home thursday after seven and see that you call, I know you didn't make it home. I miss you. Right now I'm crying because I'm going through a little stress. And my son is not making it any better With getting in trouble with the Police. I already have one son in jail and keep telling him, it's not a good place to be

I wish you where here holding me, just holding me close to you, oh I miss you! You must think I crazy keep saying I miss you, but I do. Could you tell me what's going on. I wanted to come to concert but I know your wife was going to be there and I did not

wanted to look strange. But
I care!. I see you calling me
but a good time to call is after
seven P.M. Monday thur Saturday
and starting December after 8:00
PM because of X-mas. You know
my job its finish until all the
meal is deliver.

The information on Donald
Hunter. He is on ME 2. yes he's
over there and Kevin Rey is
bald head and he's on the
street last they know. Something
else. I remember when he had
a big case and they or the
word was going around that
he's been snitching because
he seem to come home on them
Now I'm sitting here hoping
you call before your phone
time is up



Take Care
Because I Care
Beverly

321 313

Denise
(301) 843-0838
10870 Moore St
Woldof, M.D. 20603.

Tyrone
(H) (301) 513-9449
c (202)679-9611

Lawrence
(301) 613-6293

Michael
6002 Bobcat Ct
Waldorf MD 20603
301 885-0951

DARRELL
301-893-2465  H
202-645-3960  W



1. VICKY NUMBER #
2. KILLI'S ADDRESS
3. BUCK ADDRESS, BUCK NUMBER → BOW
4. BRYANT ###
5. EVIE - PAPER -12
6. DERRICK
7. PAULINE
8. YOUNGIN ??
9. LOOP
10. CHRIS

11. TELL NITE TO CALL KEVIN
12. CALLED AND SEE DERRICK HINES?
13. GO OVER TO THE HOUSE
14. CALLED REID
15. CALLED BOB
16. CALLED BEVERLY 301. 322-9046
    GET HER CELL NUMBER
    KAREN WILL HAVE IT.
17. RUEL BREMEA
    307 - 660
18. FATHER #

Government of the District of Columbia
# DEPARTMENT OF CORRECTIONS

## CLOTHING, PERSONAL PROPERTY, AND CASH RECORDS NO. 182119

Date _____ Name _____ DCDC# _____

Crime _____ Sentence _____

### CLOTHING

| | | | |
|---|---|---|---|
| Belt _____ | Hat _____ | Scarf _____ | Tie _____ |
| Boots _____ | Housecoat _____ | Shirt _____ | T-Shirt _____ |
| Brassiere _____ | Jacket _____ | Shoes _____ | Sweat Shirt _____ |
| Cap _____ | Keys _____ | Skirt _____ | Sweat Pants _____ |
| Change Purse _____ | Misc. Papers _____ | Slip _____ | Wig _____ |
| Coat _____ | Pants _____ | Socks _____ | Other _____ |
| Dress _____ | Permit _____ | S.S. Card _____ | Other _____ |
| Girdle _____ | Purse _____ | Stockings _____ | Other _____ |
| Gloves _____ | Raincoat _____ | Sweater _____ | Other _____ |

### PERSONAL PROPERTY (Including Jewelry)

| | | | |
|---|---|---|---|
| Billfold _____ | Earrings _____ | Rosary _____ | Other _____ |
| Bracelet _____ | Medallion _____ | Tokens _____ | Other _____ |
| Check Book _____ | Necklace _____ | Watch _____ | Other _____ |
| Credit Cards _____ | Rings _____ | Other _____ | Other _____ |

Misc. Property stored in Property Room _____

### CASH

I, _____ DCDC# _____ Certify

that when received at the DC Jail on _____ I had $ _____ cash

and the property and clothing listed above. I fully understand that any clothing or property unclaimed
after fifteen (15) days of my commitment or that is returned by the US Postal Service for any reason,
will be destroyed.

_____
Receiving Officer's Signature

_____
Inmate Signature No.

No. _____

The D.C. Department of Corrections Detention Facility will not be responsible for any valuable worth
more than fifty dollars ($50.00).

### Prisoner must keep a signed copy of this paper until released.

CONTROL NO. 182119

INMATE COPY

Form # CPPCR

1089 Moore
Walldof MA 20043

20003+2534

Mr. Ambrose Jones
241-912
1901 D Street SE
Washington DC 20003



Tuesday

Hi Neicey

You won't be suffering in I can help it. Theres alot of things that could have been done in our case that wasn't and for that we did lots of time, but not in this case because I'm going to make sure he stays on top of everything so he can beat it way before a trial or plea. Youre a good woman I take that back your a super great woman and there won't be tears in your eyes for long.

Heres whats going on. I've sent Toina another letter detailing the motions that needs to be filed right away within the 2-4 weeks of anyones arrest. These motions will tell him what evidence they have and plan to use, who the government witness are and what they said, how they came to the conclusion of him being involved in any thing, the level and strength of what they have, who's his co-defendants and co-conspiritors and everything pretaining to his case per se. Also I placed a motion and court order so that he can have the maximum time allowed in the law library per wk to better understand the legal aspect of the case. Theres also the bond motion which he needs to renew each month.

Now what helps him in the bond motion is letters from people who knows him as to living in the metro politian Area saying he's been a resident for years and never pose a threat, any body that has a business or business letter head is even better. these letters should be affidavits which is more recognized than anything.

Now the motion and court order for the law library should be typed if you can and send him 3 copies of the order 3 copies of motion this way he will have enough in case he can't get to the library for copies

These other motions I'm listing are what the lawyer needs to file right away and he knows this he should if he's a serious lawyer. Antoine needs to file them if the lawyer does not and he need to make sure they're filed. To do this he only needs to write the Clerks office Criminal Division at the court and request a copy of the Criminal Docket in his case.

Here are the motions the lawyer needs to file or Antoine should file.

(1) Motion for Disclosure of similar Acts & Evidence

(2) Motion for Disclosure of Exculpatory Evidence

(3) Motion for Bill of Particulars

(4) Motion to Compel Discovery

(5) Motion for Pretrial Determination of Admissibility of co-conspirators statements pursuant to FRE 801 (d) (2) (E)

(6) Motion for review and revocation of detention order

   (I'm certain one was placed on him = no bond) this is where the affidavits will come into place in helping his credibility to make bond.

   Neicey I'm sorry that I can't do the things I want, being in lock down doesn't allow one much assess to what I need but I'll give you what I already know okay. Be strong Neicey, it's the beginning and if things are done right he should be out before a trial can start. By the way did they leave a copy of the search or arrest warrant with you which was it and did the search the place. Know that you and lil Antoine are loved!   Love R.. ??.. ??

Moore St
MD 20603

SE7/46

Mr. Antoine Jones
241-912
1901 D Street SE
Washington DC 20003

20003+2534

Hey Baby,

Today is Nov 8th which means that tomorrow is our anniversary. Hopefully by the time you get this letter the judge in this case will realize all of this was a mistake and the entire matter will have been dropped already. I am trying to listen to the positive side of this and focus my energy on praying through this. It is so hard to stay focused and strong. I can't remember when I have prayed this much before. I need God so much right now just to keep me from breaking down. I can't think clearly at times and sometimes I can't stop crying. Sis Haymes and Mother Jennings invited me to come and stay with them to try to relax my nerves, my Aunt Hilda did too. As upset as I am, I can't go anywhere I just have to stay here and deal with each day one day at a time.

①

I am so confused because of what I heard in court and the news kept saying that the club was connected, but then in court they said something different. Everyone says that black men are convicted because of the color of their skin I don't like to listen to talk like that but when things like this happen it shows just how eager people were to destroy the club and to destroy the names of people who without even knowing the facts This is really an ugly side of life where the press uses its influence to kill the Black man and I don't like what I see They have decided to make you look guilty. Anyway, I just hope this ugly nightmare goes away quickly I can't wait to get my life back to some sense of normalcy. I hope they don't read your mail The thought of someone reading your mail is sickening to me

②

The reason I was so upset yesterday
is because I spoke with your
attorney and he said that they
are not going to drop the case
but they are going forward with
a trial. He also said they would
not consider releasing you on bond
before the trial ends. I just could
not stop crying. I think I won't
answer the phone where I am
upset like that. I also don't like
sending you letters with a bunch of
sobbing. So I will try to turn
this letter around now.

Antoine said he wants to transfer
to another school next year. He wants
to go to North Carolina. It sounds
okay to me but let me know
what you think about it. Actually
a change of scenery might do us
all some good.

I am sure they planted all
kind of devices in my house and
you need to not under estimate
these people. I had to take the
computer to the shop.

③

me and Antoine around and I am
sure they planted divices at my
mothers house too. It just bothers
me because they take innocent
situations and make them into
a federal criminal case and they
have so much power over the
entire judicial system. You just
can't afford to under estimate
these people. The agent won't
return my calls, she is holding
my car just to be mean and
I think they will do anything to
make our lives more miserable.
It just makes no sense to me.
It is just a job to them but it
is life to me and my family.
They held guns on us and I
thought they just wanted to kill
you. We were naked so it was
impossible for us to be armed. I
am trying to push those memories
from my mind. I would not
wish that nightmare on my
worst enemy.

this entire matter to be dropped
I have to live through this one
day at a time but I want it
to go away I don't want this
to leave me with a heart full
of bitterness or hatred. I have
to be focused and prayerful. I
hope you are praying sincerely
for us because we really
need your prayers.

Love
Nicey



re Deniece 301 843 0838 -H
240 416 2249 -c

mother
is if

called
3-0191
2008        ADRIEN
            mother
            number
Have a
re, $4,500

at Funds Buck
:f the
vels
BANK
the

VY # 240-398-0771

? Bryant - Bow
? Iwie - Rot Remich - Pline
? Back
? Vickie - lawyer - h.lls
? Getting cars back
? House Back
? ~~Bat~~
?

Call Robin 202 276-8519 · Harold

1) Willis Hodges
2) Buck work osap
3) Detoid Number ???
4) Bryant - Bou
5) Phoeline ??
6) Get car from cousin
7) Get VIP Pass for TCB & Backyard CHRIS —

8) Fat derrick up here Saturday with Bryand - Ivie or LA

9) Tell Derrick Ivie and Bryand to tell me if CAN'T VISIT

10) Dont forget to tell Kidd, Swell and share nephew want Kevin is the most important

11) Call Beverly

14) Roel Brenes 307-060

15) CORP-1900 BINK-1000

18) Tell CHRIS'S to Print a couple of VIP Pass for the Halloween Party we was going to do

Print a couple of VIP Tickets with all of our parties

19)

10) Get Lawrence Jose & Club levels papers



301 843-0838

② MIKE 301 885-0981 - 240 846 7889

③ ADRIEN 301 423 0191

④ DEB 301 809 0771, 240 388-
WK 202 295 4510 #235            1424

⑤ TYRONE J- 301 513 9449 - N
202 636 2793 - C

⑥ LAWRENCE 301 613 1292
301 404 - 2442

⑦ CLUB LEVELS 202 269-0100
(For Derrick +

⑧ A EDUARDO BAIARLZO - LAWYER
202 639 - 0999

⑨ NEILE 202 391-9206 - C
301 870-2584 - M   4-8-0
LAL cell 202 492-3342 / 202 409-2383

⑩ FATHER 202 232-1562  ??

⑪ LYE- resident 202 479-2331
202 492-3342

⑫ BEVERLY 301 322 9046 -N
240 853-6543 C  ???

⑬ I VIE
240 398-0771

⑭ BRYANT                 301 638-5031
Patrick 301 982-3063

⑮ P-ine                DARRell 301 813 2465
WK 202 645 3760

⑯ Antoine cell

⑰ Lou cell 202 226-8519

⑱ Buck 202    256 1072    301 373/
240 4510   288 4365

⑲ Vicky-240 475 1125
(Chris abaro)

⑳ Derrick          BUCK 202
256 1072

㉑ KABZY           V. cell 72-0
475-1125

㉒ CHRIS

㉓ Youngin - Receo —

capital Legal #58
Fitzzsural
Fizurno

Dustin 2/598
2803

2/49/
7/51
LD10-20



*JOHN BEVINGTON*

1            UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    ------------------------------X

4    THE UNITED STATES OF AMERICA      Criminal Case No. 05-386

5                    v.              ***VOLUME 19 - A.M. SESSION***

6    ANTOINE JONES, et al,

7                  Defendants,

8    ------------------------------X    Washington, D.C.
                                        Tuesday, December 18, 2007
9                                       9:40 A.M.

10                    TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11          UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Government:          JACK GEISE, ESQUIRE
                                  RACHEL LIEBER, ESQUIRE
14                                Office of the U.S. Attorney
                                  555 4TH Street, N.W.
15                                Washington, D.C.  20560
                                  (202) 616-9156
16

17   For Defendant Jones:        EDUARDO BALAREZO, ESQUIRE
                                  400 Fifth Street, N.W.
18                                Suite 500
                                  Washington, D.C.  20001
19                                (202) 639-0999

20

21   Court Reporter:             Lisa Walker Griffith, RPR
                                  U.S. District Courthouse
22                                Room 6507
                                  Washington, D.C.  20001
23                                (202) 354-3247

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.

DF created with pdfFactory trial version www.pdffactory.com

Q   So the answer is no?

A   No.

Q   Now, you indicated that you have not been involved in what Ms. Lieber termed the nuts and bolts of this case, right?

A   That's correct.

Q   You yourself testified that you have not listened to any of the calls in this case, right?

A   I don't recall listening to any of these conversations.

Q   Have you listened to them or have you not?

A   It's possible that I could have been in the Title III room at one point and heard a call.  I do not recall that.  I don't believe that I did.

Q   You did have a role in this case, though, right?

A   I have participated, my recollection, in two events in this.

Q   One of those events was the search warrant, which was carried out at the Gloria Drive address, which is the home of John Adams, right?

A   Correct.

Q   What was the other event that you were involved with?

        MS. LIEBER:  Your Honor, may we approach?

        THE COURT:  I guess we can.

        (Bench conference.)

        MS. LIEBER:  I just want to be sure you know where --

1          THE COURT:  What is the answer?

2          MS. LIEBER:  I flagged this for Mr. Balarezo

3   yesterday just so he knew that Agent Bevington -- so this

4   wouldn't happen.  That's why I raised this with Mr. Balarezo

5   yesterday.  That he conducted the search warrant on

6   Mr. Jones's jail cell, I don't know if you want to go there

7   but I was trying to --

8          MR. BALAREZO:  No, obviously I don't.

9          THE COURT:  That's helpful for her to remind you.

10  We won't go there.

11         MR. BALAREZO:  No.

12         THE COURT:  All right.

13         (Open Court.)

14         THE COURT:  That question is withdrawn?

15         MR. BALAREZO:  I'll withdraw the question.

16  BY MR. BALAREZO:

17  Q   So you did do the search warrant of Adams's house?  Were

18  you the lead agent in that house?

19  A   Originally, I was assigned to be the team leader and

20  seizing agent at that house.  But ultimately I had to be in

21  court.  So, I was involved in the entry and left within 30

22  minutes after we were inside the house.

23  Q   Now, you said that you've been involved with about 500

24  search warrants in your experience, right?

25  A   That's a rough number.  I'm saying hundreds.  I believe

PDF created with pdfFactory trial version www.pdffactory.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | |
| v. | : | **Criminal No. 05-386(1) (ESH)** |
| | : | |
| ANTOINE JONES | : | |

### DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE FROM DEFENDANT'S JAIL CELL

Defendant Antoine Jones ("Jones"), by and though undersigned counsel, and

pursuant to the Fourth Amendment to United States Constitution and applicable case law, hereby

respectfully moves to suppress tangible evidence seized from Jones' jail cell by law enforcement

agents. In support of this Motion, Jones states as follows:

### FACTS

As the Court is well aware, Jones was initially charged in a Superseding

Indictment with Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or

More of Cocaine and Fifty Grams or More of Cocaine Base (Count 1); Unlawful Possession with

Intent to Distribute 50 Grams or More of Cocaine Base (Count 2); Unlawful Possession with

Intent to Distribute Cocaine and Aiding and Abetting (Count 3); and Use of a Communication

Facility to Facilitate a Drug Trafficking Offense (Counts 5 -34). The government's general

allegation is that Jones was part of a narcotics conspiracy from at least 2003 until October 24,

2005, which spanned from the District of Columbia, Maryland, Texas, North Carolina and

elsewhere. In particular, the government alleges that Jones was the primary supplier of cocaine

to members of the organization in the District of Columbia and Maryland.

After his arrest on October 24, 2005, Jones was presented before Magistrate

Judge Robinson, who ordered him held without bond pending trial. On November 22, 2005,

Metropolitan Police Detective Norma Horne swore out an Application and Affidavit for Search

Warrant. (*See* Exh. 1). Detective Horne sought a warrant to search the "entire jail cell and

personal property of Antoine Jones, D.C. Jail, 1901 D. Street, Southeast, Washington, D.C."

(*Id.*). Magistrate Judge Kay issued the warrant that same date. Agent Horne and other agents

carried out the search on November 23, 2005, and seized several items from Jones' cell. (*See*

Exh. 2). The inventory list of the search indicates that the items seized were "Miscellaneous

documents to include – Washington Post article, 9 [10 is crossed out and initialed JCB] pieces of

paper with names and/or numbers + 3 envelopes that each contain a letter." (*Id.*) The

government has informed Jones that it intends to introduce several of the items recovered from

Jones' cell at trial.

## ARGUMENT

### I. JONES HAD AN EXPECTATION OF PRIVACY IN HIS JAIL CELL

The Fourth Amendment provides that "the right of the people to be secure in

their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the person or things to be seized ..."

U.S. Const. amend. IV. Prisoners do not have an expectation of privacy with respect to searches

motivated by institutional security concerns and performed by prison officials. *See Hudson v.*

*Palmer,* 468 U.S. 517, 527 (1984); *United States v. Cohen,* 796 F.2d 20, 22-23 (2d Cir.1986).

However, when a search is performed or initiated by law enforcement officials other than those

in charge of a prison and is unrelated to institutional security concerns, a prisoner has a

reasonable expectation of privacy with respect to that search. *Cohen,* 796 F.2d at 23-24.

In this case, it is clear that the search of his cell was motivated not by institutional

2

concerns of the D.C. Jail, but rather initiated by law enforcement officers. Thus, Jones had an expectation of privacy pursuant to the Fourth Amendment.

## II.    THE AFFIDAVIT IS UTTERLY LACKING IN INDICIA OF PROBABLE CAUSE

It is established law, see *Nathanson v. United States*, 290 U.S. 41, 47(1933); *Giordenello v. United States*, 357 U.S. 480, 485-86 (1958); *Aguilar v. Texas*, 378 U.S. 108, 114-115 (1964), that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter.   If the warrant is "facially deficient," for example, in failing to particularize the place to be searched or the things to be seized, suppression is appropriate despite a magistrate's stamp of approval. *See United States v. Leon,* 468 U.S.897, 923 (1984).   Or, if the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," suppression is available. *Id.* (citing *Brown v. Illinois,* 422 U.S. 590, 610-11 (1975).

If a magistrate abandons his neutral and detached role, good faith reliance on the warrant will not prevent suppression. *See Leon,* 468 U.S. at 923.   Furthermore, "if the magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his disregard of the truth," suppression is appropriate. *See Id.* at 923 (citing *Franks v. Delaware,* 438 U.S. 154 (1978)).   And finally, if "it is plainly evident that a magistrate or judge had no business issuing a warrant," the exclusionary rule will still be applicable. *See Massachusetts v. Sheppard, supra,* 468 U.S. at 990 n. 7, 104 S.Ct. at 3429 n. 7 (quoting *Illinois v. Gates,* 462 U.S. 213, 264, 103 S.Ct. 2317, 2346, 76 L.Ed.2d 527 (1983) (White, J., concurring in judgment)).

3

The government will likely argue that Magistrate Judge Kay issued a proper warrant and that the law enforcements agents who carried out the search of the cell did so in good faith reliance of the warrant. Explicit in *Leon*, however, is the view that not every act of reliance on the intervention of a judge or magistrate will automatically eliminate exclusion as the appropriate remedy for constitutional or statutory violations.

In this case, Detective Home's Application for the search warrant indicates that the items to be seized as:

### ATTACHMENT A

1.   Books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances;
2.   Letters, notes, and other papers relating to the coverup of past distribution of controlled substances, including letters of instruction to non-incarcerated individuals;
3.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances; and
4.   Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, photographs, personal telephone books, diaries, and identification documents.

(*See* Exh. 1 at 2).

Her fourteen page Affidavit contains the following:

a.   four pages of a boilerplate and non-specific description of her experience, training and education;

b.   eight pages of the allegations made against Jones, including evidence obtained prior to the wiretap, during the wiretap, during the takedown, and through the use of intercepted jail calls. An overwhelming part of these eight pages is devoted to Lawrence Maynard allegedly being Jones' "right hand man." Included in this tome regarding Maynard is a part regarding letters written by Jones to be delivered to Maynard via Beverly Johnson.

4

Horne avers, "Specifically, <u>investigators believe that JONES has sent letters to MAYNARD via O'NEAL</u>, which speak of the details of ongoing narcotics trafficking, including the possible concealment of evidence, and the continuation of the business, and <u>that MAYNARD has kept these letters in his possession</u>, as is common in the illegal narcotics trade." Further, Horne avers that, "Based on these calls, and on MAYNARD's identified role in JONES's [sic] narcotics' trafficking operation, <u>investigators believe that MAYNARD has evidence pertaining to narcotics-trafficking in his possession</u>, to include letters from ANTOINE JONES." (See Exh. 1 at 12)(emphasis added).

c.     one paragraph with the heading "Probable Cause for Individual Location," which states nothing more than the location to be searched and a description of Jones as an inmate at the D.C. Jail. (See Exh. 1 at 13).

d.     one paragraph with the heading "Offenses," which lists "Attempted obstruction of justice and witness tampering, in violation of 18 U.S.C. §§ 1510, 1512, and 1513, and violations of the Controlled Substances Act, Title 21, United States Code, Section 801, <u>et seq.</u>, including: (a) the possession with intent to distribute and distribution of controlled substances, in violation of Title 21 United States Code (USC) § 841(a)(1); and (b) conspiracy to commit such offense, in violation of 21 U.S.C. § 846." (See Exh. 1 at 13).

On its face, the Affidavit fails to allege any set of facts that Jones in any manner attempted to obstruct justice or tamper with witnesses or engage in narcotics-related activities from his jail cell. In fact, the entire factual portion of the affidavit focuses on Maynard and notes that investigators believe that Maynard, <u>not</u> Jones, had kept letters from Jones in his possession and that Maynard, <u>not</u> Jones, had evidence pertaining to narcotics-trafficking in his possession.

The government may also argue that it had source information that Jones, through communications from his cell, was attempting to tamper with witnesses. For example, via letter dated December 5, 2005, AUSA Lieber informed counsel that

> As I mentioned, in early November, we received information through various channels, including from agents wholly unrelated to this investigation, that [Jones] was attempting to identify witnesses against him and 'take care of them.' Based on this information, we obtained copies of all calls your client made from the D.C. Jail.[1] Then, based on some of the discussions he was having with individuals in the community, in conjunction with this source information, we obtained a search warrant for your client's cell . . . .

(*See* Exh. 2 at 2). Although the government may have had this source information about Jones' alleged attempts to locate or intimidate witnesses, Horne failed to include this information on the Affidavit.

On the facts of this case, the underlying affidavit is entirely lacking in indicia of probable cause. *Leon* clearly and unequivocally states that when the affidavit itself is entirely lacking in indicia of probable cause, it cannot be said that the officer acted in good faith in relying on a warrant that issues. That is the precise situation we have in this case.

"All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde,* 440 F.3d 1065, 1067 (9th Cir.2006) (en banc) (quoting *United States v. Anderson,* 453 F.2d 174, 175 (9th Cir.1971) (internal quotation marks omitted)). Where the affidavit itself lacks *all* indicia of probable cause, it would unduly undermine the foregoing rule to permit extrinsic indicia of probable cause to be presented through an unsworn, unrecorded oral colloquy. Related to the foregoing, the Constitution also requires that probable cause be established "by Oath or affirmation." If unsworn, unrecorded oral colloquies, which may not be

---

[1] Jones also moves to suppress these calls because, upon information and belief, the government did not obtain these calls pursuant to a lawfully authorized subpoena or warrant.

used to establish probable cause, *are* admissible to establish good faith, the constitutional and prudential standards for showing probable cause will be undermined. In effect, the good faith exception would swallow the Fourth Amendment rule. *See United States v. Luong*, 470 F.3d 898, 905 (9th Cir. 2006).

### III.   THE SEARCH VIOLATED THE ATTORNEY-CLIENT PRIVILEGE

Federal courts recognize the attorney-client and work product privileges as doctrines that serve to protect confidential communications between attorneys and their clients, as well as the mental impressions and legal strategies developed by attorneys in anticipation of litigation. *See Fisher v. United States,* 425 U.S. 391, 403 (1976); *Upjohn Company v. United States,* 449 U.S. 383, 389  (1981); (noting that the attorney-client privilege covers a wide range of communications with a purpose of encouraging "clients to make full disclosure to their attorneys."). While both privileges are virtually inviolable, this is only true if the proponent of the privilege can establish that the privilege exists in the first instance, and that it has not been waived. *See United States v. Bump,* 605 F.2d 548, 551 (10th Cir.1979).

To determine the existence of either an attorney-client or work product privilege, courts focuses on whether the client who communicates the information or the attorney who creates the work product has a "justifiable expectation" that the information will remain secret. *In re San Juan Dupont Plaza Hotel Fire Litigation,* 859 F.2d 1007 , 1015-16 (1st Cir.1988).  A waiver can be express or implied by conduct. "Implied waiver occurs when a party claiming the privilege has *voluntarily* disclosed confidential information on a given subject matter *to a party not covered by the privilege." Hanson v. U.S. Agency for International Development,* 372 F.3d 286, 293-94 (4th Cir. 2004). A client waives the privilege "by deliberately injecting into the case

7

the advice which he received from his attorney." *Smith v. Alyeska Pipeline Service Co.,* 538 F. Supp. 977, 979 (D. Del. 1982).

Materials may be covered under both the attorney-client privilege and work product doctrine. *Upjohn Company v. United States,* 499 U.S. at 398. Thus, documents prepared with the purpose of being sent to counsel for legal advice, legal opinions, legal services, or assistance in a legal proceeding are held to be privileged. *In re Spalding Sports Worldwide, Inc.,* 203 F.3d 800 (Fed. Cir.2000).

The government has informed Jones that it intends to use at trial several pages seized from Jones' cell that contain lists of names. These pages (*See* Exh. 2 at 10 & 17), were made by Jones at the direction of counsel. At the beginning of this case, counsel asked Jones to make a list of all the individuals who may have information regarding this case (possible witnesses) and all the individuals who may be in a position to testify against him (cooperators). Jones did so, but before he could provide the lists to counsel, the government searched his cell and seized the lists. The government cannot seriously argue that Jones somehow waived the privilege. When documents are secured through the execution of a search warrant, the production cannot be said to be voluntary. *See Transamerica Computer v. International Business Machines,* 573 F.2d 646, 651 (9th Cir.1978).

Additionally, upon information and belief, the items seized from Jones' cell were not kept by a "taint team." Rather, they were kept by the very prosecutors and law enforcement officers that are part of this case. Counsel concludes this by the fact that AUSA Lieber faxed to counsel copies of the seized documents. Accordingly, Jones requests that the Court conduct an evidentiary hearing to explore whether the government improperly intruded on Jones' attorney-

client privilege through the abuse of its "taint team" procedures, and, if so, to determine the

extent to which sanctions should be imposed against the government or its counsel.

       **WHEREFORE** for the foregoing reasons, and any others that may appear to the

Court, Mr. Jones respectfully requests that this Motion be **GRANTED**.

Dated:  Washington, DC
       July 26, 2007                  Respectfully submitted,

                            **LAW OFFICE OF A. EDUARDO BALAREZO**

                             /s/
             By: _____
                 A. Eduardo Balarezo (Bar # 462659)
                 400 Fifth Street, NW
                 Suite 300
                 Washington, DC  20001
                 (202) 639-0999

                 *Attorney for Defendant Antoine Jones*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of July 2007, I caused a true and correct copy of the foregoing  Defendant Jones' Motion to Suppress Tangible Evidence from Defendant's Jail Cell to be delivered to the parties in this matter via Electronic Case Filing (ECF).

_____

A. Eduardo Balarezo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :
        v.                        :        Criminal No. 05-386(1) (ESH)
                                  :
ANTOINE JONES                     :

## DEFENDANT'S REPLY TO GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE USE OF EVIDENCE SEIZED FROM A SEARCH OF HIS JAIL CELL

Defendant Antoine Jones ("Jones"), by and though undersigned counsel, and

pursuant to the Fourth Amendment to United States Constitution and applicable case law, hereby

respectfully submits his reply to the Government's Memorandum in Support of its Opposition to

Defendant's Motion to Preclude Use of Evidence Seized From a Search of His Jail Cell. Jones

states as follows:

1.      The government seeks to convince the Court to allow it to introduce a

letter from Beverly Johnson seized during a search of Jones' cell. The government's theory

regarding the letter is that "Jones was trying to figure out who the mystery witnesses were

against him, and he was seeking Ms. Johnsons' help in locating these potential witnesses and

determining whether they were, in fact, cooperating against him." Gov. Supp. Memo. At 3.

2.      The government's theory of relevance is fanciful at best. First, the

government claims that "all three documents are relevant in that they support the claims of

government witnesses Donald Hunter and Kevin Ray, when they testify that they were customers

of Jones." (Gov. Memo. At 2). The government further muses "[w]hy . . . would the defendant

be making such a list of potential witnesses, if these folks had nothing damaging to say about

him?" (*Id.*). Well, an obvious answer would that counsel asked Jones to make a list of possible

witnesses (good or bad) or cooperators from which counsel could begin investigating this case;

not, as the government surmises, because of a guilty conscience.  Specifically with respect to the

Beverly Johnson letter, Mr. Jones submits that any action he took to uncover witnesses was at the

direction of counsel during the investigation of this case and in preparation for trial.

Additionally, the contents of the letter are being offered for the truth of the matter asserted and

constitute rank hearsay.  *See* Fed. R. Evid. 801

       3.     If the government succeeds in obtaining the admission of these

documents, Jones certainly should be allowed to call counsel as a witness to tell the jury that the

list was made at counsel's direction and for no other reason.  Counsel's testimony would be a

direct rebuttal to the government's assertions of consciousness of guilt.  To the extent that

counsel's testimony is necessary for Jones' defense, counsel moves to withdraw so as to not

violate his professional obligations.  *See* D.C. Rule of Professional Conduct 3.7.[1]

       4.     Furthermore, nothing in the government's supplemental response

addresses the complete lack of probable cause in the four corners on the affidavit in support of

the search warrant for the jail cell.

---

[1] Rule 3.7 states:

**Rule 3.7 – Lawyer as Witness**
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a
necessary witness except where:
(1) The testimony relates to an uncontested issue;
(2) The testimony relates to the nature and value of legal services rendered in the
case; or
(3) Disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may not act as advocate in a trial in which another lawyer in the lawyer's
firm is likely to be called as a witness if the other lawyer would be precluded from acting as
advocate in the trial by Rule 1.7 or Rule 1.9. The provisions of this paragraph (b) do not apply if
the lawyer who is appearing as an advocate is employed by, and appears on behalf of, a
government agency.

**WHEREFORE** for the foregoing reason, and any others that may appear to the Court, Mr. Jones respectfully requests that his Motion to Suppress be **GRANTED** and that the government's request to admit evidence seized from Jones' cell be **DENIED**.

Dated: Washington, DC
     November 5, 2007         Respectfully submitted,

                    **LAW OFFICE OF A. EDUARDO BALAREZO**

                      /s/
        By: _____
               A. Eduardo Balarezo (Bar # 462659)
               400 Fifth Street, NW; Suite 300
               Washington, DC  20001
               (202) 639-0999

               *Attorney for Defendant Antoine Jones*

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of November 2007, I caused a true and correct copy of the foregoing Defendant Reply to Government's Supplemental Memorandum in Support of its Opposition to Defendant's Motion to Preclude Use of Evidence Seized from a Search of his Jail Cell to be delivered to the parties in this matter via Electronic Case Filing (ECF).

/s/
_____
A. Eduardo Balarezo

4

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 05-CR-386(1) (ESH) |
| | : | |
| ANTOINE JONES | : | |

### DEFENDANT JONES' MOTION FOR MODIFICATION
### OF CONDITIONS OF DETENTION

Defendant Antoine Jones ("Jones"), by and through undersigned counsel, respectfully moves the Honorable Court to issue an Order directing the Warden, Central Detention Facility to restore Mr. Jones' privileges and to modify his harsh conditions of confinement. In support of this motion, Mr. Jones states as follows:

### BACKGROUND

1.    The Court has ordered Mr. Jones held without bond since his presentment on October 25, 2005. A trial date has not yet been set but it is anticipated that a trial will take place at the earliest in the fall of 2006.

2.    Mr. Jones has been on total lockdown at the D.C. Jail since December 3, 2005. This means that his privileges are severely restricted: no telephone calls, no regular showers, no social visits, no religious services; no meaningful access to the law library. Additionally, Mr. Jones is locked down in his cell 23 hours per day and when he is allowed to leave his cell, it can be only when all other inmates in his unit are in their cells. Additionally, Mr. Jones is housed in a jail unit that holds individuals accused of violent crimes such as rape and murder. This information was gathered from case managers at the facility.

3.    As best as can be determined, Mr. Jones is in lockdown not because of any wrongdoing by him or any administrative sanction by the Department of Corrections, but rather

because the government requested it. When counsel communicated with the case managers he requested information regarding why Mr. Jones was being held under such harsh conditions. None of the case managers would provide that information. However, Mr. Jones has been told that the government directed the Department of Corrections to impose such conditions although no one at the jail will give him that information in writing.

      4.     Although "prison officials are entitled to impose upon a detainee whatever restrictions or disabilities are reasonably necessary to ensure the internal security of the institution and to effect his eventual presence at trial; restrictions or conditions that are intended as punishment, however, or that are not 'reasonably related to a legitimate governmental objective' violate due process." Brogsdale v. Barry, 926 F.2d 1184, 1190 (D.C. Cir. 1991) (quoting Bell v. Wolfish, 441 U.S. 520, 536-40 (1979)).

      5.     The harsh conditions under which Mr. Jones is being held are infringing upon his Constitutional rights to assist counsel with his defense because he is being prevented from contacting counsel (he is denied legal calls); from contacting possible witnesses (he is denied social calls); from researching his case (has very limited access to the law library, and then can only request books that are rarely delivered to him). Additionally, at the beginning of this case, counsel asked Mr. Jones to make a list of all the individuals who may have information regarding this case. Mr. Jones did so, but before he could provide the list to counsel, the government searched his cell and seized the list. Since that time, counsel has advised Mr. Jones to not write anything down for fear that the government will again enter his cell and seize privileged material. Clearly, such governmental intrusions have a chilling effect on the attorney-client relationship.

6.    Mr. Jones' conditions of confinement do not appear reasonably necessary to ensure internal security at the jail nor to effect his presence at trial, and there is no evidence that they are reasonably related to a legitimate governmental objective.  The conditions appear to be solely punitive in nature and thus violate his due process rights.

4.    Notwithstanding his current bond condition, Mr. Jones is presumed innocent and his harsh conditions of pretrial detention are unjust, unwarranted and are solely designed to punish him.

WHEREFORE, for the foregoing reasons Mr. Jones respectfully moves the Honorable Court to issue an Order directing the Warden, Central Detention Facility to restore Mr. Jones' privileges and to modify his harsh conditions of confinement to the least restrictive conditions.

A HEARING ON THIS MOTION IS REQUESTED.

Dated:  Washington, DC
      February 26, 2006          Respectfully submitted,

**LAW OFFICE OF A. EDUARDO BALAREZO**

By: _____
      A. Eduardo Balarezo (Bar # 462659)
      400 Fifth Street, NW
      Suite 300
      Washington, DC  20001
      (202) 639-0999

      *Counsel for Antoine Jones*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of February 2006, I caused a true and

correct copy of the foregoing Defendant Jones' Motion for Modification of Conditions of

Confinement to the parties in this matter via Electronic Case Filing (ECF).


                                                _____

                                                A. Eduardo Balarezo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 05-386(1) (ESH) |
| | : | |
| v. | : | |
| | : | |
| ANTOINE JONES | : | |
| Defendant. | : | |
| | : | |

GOVERNMENT'S RESPONSE TO DEFENDANT JONES'
MOTION FOR MODIFICATION OF CONDITIONS OF DETENTION

The United States, by its counsel, the United States Attorney for the District of Columbia,

opposes the defendant's motion for modification of condition of detention and in support of its

opposition says as follows:

## FACTUAL BACKGROUND

Jones is charged with Conspiracy to Distribute and to Possess with the Intent to Distribute

5 Kilograms or More of Cocaine and 50 Grams or More of Cocaine Base. An extensive

recitation of the facts in this case has already been supplied to the Court and counsel in the

Government's proffer in support of detention. Based on that information, and a ruling by

Magistrate Judge Robinson, this Court determined that Jones should be detained pending trial as

a danger to the community.

The Court's ruling on detention focused on the events leading up to the defendant's arrest

on October 24, 2005. After Jones' arrest and detention a confidential source unrelated to this

investigation reported that it was rumored that "the guys from Levels" thought they had figured

out that a particular person was cooperating and that they were trying to find someone to kill the

suspected cooperator. A review of Jones' telephone calls from the jail reveals a conversation in which he is trying to find the location of a coconspirator who had been incarcerated in early October on other charges but not yet indicted in this case. A search of Jones's jail cell resulted in the recovery of a letter from one of Jones' girlfriends in which, apparently in response to a request from Jones, she supplies the location of that coconspirator. The same letter reports that another individual is "on the street" and supposed to be "hot". Also recovered from the cell was what appears to be a list of individuals Jones suspects are government witnesses.

After the events described above the United States Attorney's Office asked the detention facility that Jones be placed in a custody statue that would restrict his ability to communicate with individuals other than his counsel. Subsequent to that request the government learned from yet another source of information that Jones had written letters identifying at least one he suspects is cooperating.

## DISCUSSION

These facts give strong reason to believe that Jones was attempting to identify and locate potential government witnesses with the intent to intimidate them or worse. The Supreme Court has recognized that, in addition to assuring the appearance of a defendant at trial, conditions of detention may be imposed that "go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial." *Bell v. Wolfish*, 441 U.S. 520, 540 (1979). The protection of witnesses would seem to be a classic example of a concern that, while it may not go to the physical presence of the defendant, is critical to the effective administration of justice.

The defendant suggests, Jones motion at ¶ 6, that the conditions imposed are intended to punish him. This claim is undermined both by the information already outlined and the fact that Jones is the only defendant in this case for whom the United States has sought restrictions of this

type.

The defendant also argues that the presumption of innocence is in some way implicated by these conditions of confinement. Jones motion at ¶ 4 However, as *Bell* makes clear, the presumption of innocence "has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun." *Id*. at 533.

At the moment, there seems to be no practical alternative to the conditions that have been imposed on Jones, given the evidence of potential witness intimidation.

WHEREFORE, the government requests that the Court deny the defendant's motion.

Respectfully submitted,

Kenneth L. Wainstein
United States Attorney
D.C. Bar No. 451058

_____

John V. Geise
Assistant United States Attorney
D.C. Bar No. 358267
Organized Crime and Narcotics Trafficking
555 4th Street, N.W., Room 4126
Washington, D.C. 20530
(202) 616-9156; Fax: 514-8707

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing by ECF upon counsel for the defendant, this 16th day of March, 2006.

_____

John V. Geise

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 05-386(1) (ESH)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANTOINE JONES** | : | |
| **Defendant.** | : | |
| | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION FOR AN ORDER PROHIBITING TRANSFER OF THE DEFENDANT
## OUTSIDE THE DISTRICT OF COLUMBIA

The United States, by its counsel, the United States Attorney for the District of Columbia, opposes the defendant's motion to prohibit his transfer outside the District of Columbia and in support of its opposition says as follows:

### FACTUAL BACKGROUND

Jones is charged with Conspiracy to Distribute and to Possess with the Intent to Distribute 5 Kilograms or More of Cocaine and 50 Grams or More of Cocaine Base. An extensive recitation of the facts in this case has already been supplied to the Court and counsel. That proffer is attached to this pleading in the unlikely event the Court or counsel needs to print another copy. Based on that information, and a ruling by Magistrate Judge Robinson, this Court has already determined that Jones should be detained pending trial as a danger to the community.

The Court's ruling on detention focused on the events leading up to the defendant's arrest on October 24, 2005. After Jones' arrest and detention a confidential source unrelated to this investigation reported that it was rumored that "the guys from Levels" thought they had figured out that a particular person was cooperating and that they were trying to find someone to kill the

suspected cooperator. A review of Jones' telephone calls from the jail reveals a conversation in
which he is trying to find the location of a coconspirator who had been incarcerated in early
October on other charges but not yet indicted in this case. A search of Jones's jail cell resulted in
the recovery of a letter from one of Jones' girlfriends in which, apparently in response to a
request from Jones, she supplies the location of that coconspirator. The same letter reports that
another individual is "on the street" and supposed to be "hot". Also recovered from the cell was
what appears to be a list of individuals Jones suspects are government witnesses.

At present Jones is being housed in a facility in the District of Columbia. As far as the
government is aware, there are no pending plans to relocate Jones.

<div align="center">**ARGUMENT**</div>

As a general proposition prison administrators "should be accorded wide-ranging
deference in the adoption and execution of policies and practices that in their judgment are
needed to preserve internal order and discipline and to maintain institutional security." Bell v.
Wolfish, 441 U.S. 520, 547 (1979). Thus "even when an institutional restriction infringes a
specific constitutional guarantee... the practice must be evaluated in the light of the central
objective of prison administration, safeguarding institutional security." Id.

If Jones were housed at some distance the Court, in order to assess any impact on the
right to counsel, might appropriately ask questions such as: how often does counsel have to meet
with his client; how difficult does the distance make effective meetings; etc. In doing the
balancing mandated by Bell v. Wolfish the Court would also want to make an inquiry concerning
the reason for any such relocation: is Jones being threatened; is he threatening others; is there
overcrowding at the jail; etc.

<div align="center">2</div>

But, of course, none of this has happened so the Court can't make any balancing judgement since there isn't anything to balance. Recognizing this, and the deference to be accorded the judgment of prison officials, it would inappropriate for the Court to grant a motion of this type "prophylactically". Defense Motion at 2.

WHEREFORE, the government requests that the Court deny the defendant's motion.

Respectfully submitted,

Kenneth L. Wainstein
United States Attorney
D.C. Bar No. 451058


John V. Geise
Assistant United States Attorney
D.C. Bar No. 358-267
Organized Crime and Narcotics Trafficking
555 4th Street, N.W., Room 4126
Washington, D.C. 20530
(202) 616-9156; Fax: 514-8707


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing by ECF upon counsel for the defendant, this 6th day of January, 2006.


John V. Geise
Assistant United States Attorney

3

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Criminal No.:** 05-386-1(ESH) |
| | : | |
| v. | : | |
| | : | |
| ANTOINE JONES | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SUPPLEMENTAL FILING
## CONCERNING CONDITIONS OF CONFINEMENT

The United States, by its counsel, the United States Attorney for the District of Columbia,

supplements its opposition to the defendant's motion for modification of conditions of

confinement as follows:

A hearing on the defendant's motion to modify conditions of confinement is set for

Friday, March 24, 2006. In anticipation of that hearing the United States wishes to provide the

Court and counsel with both a summary of the evidence it intends to present at the hearing or

under seal and a proposal.

## I. OUTLINE OF EVIDENCE

### A. Affidavit Under Seal

An affidavit under seal has been provided to the clerk's office concerning information

derived from or about confidential sources.

### B. Jail Calls

Over the course of his incarceration at the District of Columbia Jail, Jones has made

numerous telephone calls, which were recorded by the Jail. Among those calls were several to

Beverly Johnson, who has been identified both in calls intercepted on the wiretap and in calls

intercepted from the jail, as a romantic interest of Jones. In one call at 10:10 p.m on November 3,

2005 Jones asks Johnson to try and located a co-conspirator. Johnson indicates she know

someone in the warden's office who can help. [1]

### C. Johnson's Letter

When Jones' jail cell was searched on November 23, 2005, a letter from Johnson to

Jones was located. The last paragraph provides the location in jail for an unindicted co-

conspirator. In the same paragraph Johnson reports that another unindicted co-conspirator is "on

the street last they know." Johnson also states that this second co-conspirator has reportedly

"been snitching". This letter is attached at A.

---

[1] Although not specifically mentioning possible witnesses there were several jail calls to Deborah O'Neal , who has been identified both in calls intercepted on the wiretap and in calls intercepted from the jail, as another romantic interest of Jones. In one such telephone call, on November 3, 2005, at approximately 9:16 p.m., Jones told O'Neal that he had sent her a few letters from the jail. In particular, he mentioned that when she gets letters with another name on them, she should hold onto the letters and give them to "Lawrence" because "Lawrence" knows what to do with them. At this time Lawrence Maynard had not been arrested or indicted. Later in this approximately 15 minute telephone call, Jones reminds O'Neal that when she gets letters without her name on them, she should just hold them. In a later call to O'Neal, on November 6, 2005, at approximately 11:57 a.m., Jones and O'Neal discuss "Lawrence" at some length. Jones told O'Neal to tell "Lawrence" to write to him and let him know what was going on, because he doesn't want to be "in the blind."

In numerous conversations with his wife, Deniece Jones, Jones is heard urging her to get in contact with Maynard to tell him that Jones needs to speak with him. On a few occasions, Jones asks his wife to call Maynard on her cellular telephone, while Jones' call from the jail is underway on the landline. Jones repeatedly tells his wife to tell Maynard to come out to the jail to visit him.

When interviewed by agents of the FBI Johnson acknowledged that she had obtained this information at Jones' request. Johnson indicated she was unaware of what Jones intended to do with the information.

**D. List of possible witnesses**

Also seized from Jones' cell was a list which seemed to outline individuals Jones considered as potential witnesses. The page is attached as Tab B-1. Another seized page has enteries including a numbered list that appears to have the names os suspected cooperators. That page is attached as Tab B-2.

## II. ALTERNATE CONDITIONS OF CONFINEMENT

The office of the United States Attorney has spoken with the Marshall's Office concerning the possibility of an alternative to Jones' present conditions of confinement which would alleviate the government's security concerns while providing the defendant with a less restrictive environment. The Marshall's Office has suggested the possibility of housing the defendant in the  general population at a facility outside of the District, most probably Orange or Northern Neck. There would be additional conditions which would not restrict the defendant's movements beyond that of other general population inmates, but would give some further comfort to the government.  That would be acceptable to the United States.

Respectfully submitted,

Kenneth L. Wainstein
United States Attorney
D.C. Bar No. 451058

3

By:_____

John V. Geise
Assistant United States Attorney
D.C. Bar No. 358267
Organized Crime and Narcotics Trafficking
555 4th Street, N.W., Room 4126
Washington, D.C.  20530
(202) 616-9156; Fax: 514-8707

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing by ECF upon counsel for the defendant, this    day of March, 2006.

_____

John V. Geise

4